H

Not Reported in A.2d  
27 Del. J. Corp. L. 706  
(Cite as: 2000 WL 1724234 (Del.Ch.))

Page 32

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Claire G. RUDNITSKY and C.M.S. Associates, a general partnership of the State of Delaware, Plaintiffs,  
v.  
Steven H. RUDNITSKY, Joseph D. Kulesza, Jr., Joseph W. Benson, P.A. and Howard M. Hyman, Defendants.

No. 17446.

Submitted Sept. 15, 2000.  
Decided Nov. 14, 2000.

Richard E. Franta, Wilmington, Delaware; for Plaintiffs.

Steven H. Rudnitsky, Wilmington, Delaware; Defendants, pro se.

Joseph D. Kulesza, Jr., Agostini, Levitsky, Isaacs & Kulesza, Wilmington, Delaware; Defendants, pro se.

Andrew G. Ahern, III, Joseph W. Benson, P.A., Wilmington, Delaware; for Joseph W. Benson, P.A.

R. Karl Hill, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware; for Defendant Howard M. Hyman.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1 Pending is a motion for summary judgment by the plaintiffs, Claire Rudnitsky ("Claire") and C.M.S. Associates ("CMS") (collectively, the "plaintiffs"). By means of this motion, the plaintiffs seek the judicial invalidation of three allegedly unauthorized mortgages placed on a commercial property that is owned by CMS and located at 1624 Delaware Avenue in Wilmington, Delaware (the "Building"). [FN1] The grounds for the motion are that (i) there was no bargained for consideration flowing to the partnership (CMS) for the mortgages, and (ii) the partner who executed the mortgages on behalf of CMS lacked the authority to do so. For the reasons discussed below, the Court concludes that the plaintiffs have demonstrated their entitlement to summary judgment and to cancellation of the mortgages on both of those grounds. [FN2]

> FN1. The Building is owned by C.M.S. Associates, a Delaware general partnership in which Claire owns the majority interest.

> FN2. The plaintiffs also assert other claims related to the dissolution and winding up of CMS. With respect to those latter claims, summary judgment will be granted in part and denied in part.

I. FACTS

The material facts recited below are undisputed. In 1985, Claire, her husband, Martin Rudnitsky ("Martin"), and their son, Steven Rudnitsky ("Steven"), formed CMS, a Delaware general partnership whose purpose was to own and manage the Building. CMS, as the fee simple owner, rented the Building to another Rudnitsky entity called Normar, Inc., ("NORMAR") under a "net-net-net" lease. [FN3] NORMAR is a Delaware corporation that the Rudnitskys formed to operate their family business--a tobacco and newspaper store called the "Smoke Shop." At all times the Smoke Shop conducted its business in the Building.

> FN3. That lease provided that the tenant, NORMAR, would be responsible for paying expenses above and beyond rent, including real estate taxes and assessments, maintenance, and repairs. (CMS-NORMAR lease of July 21, 1989). Thus, the rent received by CMS was "net" of all expenses.

The original CMS partnership agreement was prepared by Joseph W. Benson, Esquire ("Benson"), a Delaware attorney who is one of the defendant-mortgagees in this action. Under the original partnership agreement, Claire and Martin were equal equity partners. As such, they were also equal owners of the building. Steven was an income (but not an equity) partner of CMS and, thus, had no equity interest in the Building.

From the outset, Claire, Martin, and Steven all participated in the day-to-day operation of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d  
(Cite as: 2000 WL 1724234, *1 (Del.Ch.))

Page 33

business. Claire tended to the customers, Martin kept the books, and Steven worked in the Smoke Shop as a NORMAR employee. Several years later, Martin became ill and Steven took over the management of CMS's finances. After Martin died on May 30, 1989, Steven continued to manage the finances with Claire's consent.

After Martin's death, Claire and Steven executed a second partnership agreement that was also prepared by Benson. Under that second agreement, Claire was the sole equity partner of CMS, and in that capacity, had full (albeit indirect) ownership of the Building. Steven continued as a CMS income partner. Importantly, under both of the Benson-prepared partnership agreements, CMS's partners were expressly prohibited from lending, spending, or giving away any part of the partnership property and from drawing any bill, note, or other security in the name of the partnership without the consent of a "majority of the partners." [FN4]

> FN4. Article 10, 1985 CMS Partnership Agreement; Article 10, 1992 Partnership Agreement.

A year or so after Martin died, the business began struggling financially under Steven's management. Because of insufficient funds, NORMAR stopped making the payments to Claire on a debt that NORMAR owed to Martin. NORMAR also discontinued paying directors' fees to Claire.

*2 On December 31, 1992, Claire and Steven executed a third--and the current--partnership agreement (the "Partnership Agreement"), which was drafted by an attorney not involved in this action. The current Partnership Agreement requires the "prior written unanimous approval of all of the partners" to "mortgage any or all of the partnership property." [FN5] At the time the Partnership Agreement was executed, Claire gifted a 45% ownership interest in NORMAR, and also a 33% equity interest in CMS, to Steven. Claire later transferred the balance of her NORMAR stock to Steven, [FN6] but she remained at all times the 2/3 equity owner of CMS, with Steven being a 1/3 equity owner.

> FN5. Partnership Agreement, Article 8(d). The Partnership Agreement, like its predecessors, also expressly prohibits CMS's managing partner from borrowing and also from executing any mortgage, security agreement, bond, or lease on behalf of the partnership. Partnership Agreement, Article 8(b). There is no evidence that Steven was selected as the managing partner, but in any event, that is of no consequence to the outcome of this motion.

> FN6. This transfer occurred in August 1997.

NORMAR's financial troubles continued to worsen: its checks were dishonored with increasing frequency, and its suppliers went unpaid, as did NORMAR's accountant and tax preparer, who eventually resigned for that reason. In the spring of 1994, NORMAR's unpaid taxes reached a level that NORMAR was required to take out a $65,000 loan from PNC Bank, Delaware ("PNC"). The PNC loan was personally guaranteed by Claire, and it was secured by a mortgage on the Building. Although the purpose of the mortgage was to raise funds for NORMAR (as opposed to CMS), the loan and mortgage instruments were executed by Steven and also by Claire, who was CMS's majority owner. Steven then used the loan proceeds to pay down NORMAR's debts.

At some point, however, NORMAR stopped making payments on the PNC loan. PNC responded by deducting the loan installment payments from Claire's accounts at PNC. Although Steven promised to reimburse Claire for the amount of those payment deductions, he never did so. In an effort to force NORMAR to resume making the loan payments, Claire closed her PNC accounts. On February 10, 1998, PNC declared the loan in default, accelerated the balance due, and threatened to foreclose on the Building. To save the Building from foreclosure, Claire was forced to pay off the PNC loan and pay PNC's attorney's fees out of her personal assets.

In July 1998, Claire received a Notice of Judgment that had been entered against her personally for NORMAR's unpaid state taxes for certain tax periods before August 8, 1997. During those tax periods Claire had been a NORMAR stockholder and officer and also its sole director. After receiving the Notice of Judgment, Claire obtained a lien search on the Building. As a result, she discovered that beginning in January 1997, Steven, without her knowledge or consent, had caused several mortgages to be placed on the

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Building.

The first of these was a $60,000 mortgage (the "Kulesza Mortgage") in favor of co-defendant Joseph D. Kulesza, Esquire ("Kulesza") a Delaware attorney, on January 14, 1997. That mortgage was granted to secure the repayment of Steven's personal debt to Kulesza for legal fees Steven had incurred in his divorce proceeding. The second mortgage, for $35,000, was granted in favor of defendant Benson (the "Benson Mortgage") on June 19, 1998 to secure Steven's personal obligation to pay both his legal fees to Benson and an obligation of NORMAR. [FN7] Lastly, Steven had executed a fourth mortgage on behalf of CMS, for $25,000 (the "Hyman Mortgage"), on November 20, 1999, in favor of defendant Howard M. Hyman, Esquire ("Hyman"), a Philadelphia attorney and Steven's cousin. The purported consideration for that mortgage was a business loan that Hyman had made to Steven.

> FN7. Steven executed another mortgage in October 1998 in favor of C.D.B. Finance Corporation ("CDB") in the amount of $17,000. After Claire discovered this mortgage as a result of the lien search, she purchased the judgment note from CDB.

*3 After discovering the existence of these mortgages, Claire called a meeting of the CMS partners for May 20, 1999. [FN8] At that meeting, Claire directed Steven to liquidate the business or relocate the Smoke Shop but, in either event, to clean out the Building and then allow the Building to be appraised and then sold to pay creditors and taxes while some positive equity remained. At that meeting, Claire also voted to dissolve the partnership (CMS). Thereafter, on behalf of CMS, she sent notice to NORMAR and Steven terminating NORMAR's tenancy of the Building, effective August 31, 1999.

> FN8. Steven and Claire were the only CMS partners, holding a 1/3 and a 2/3 interest, respectively.

By that point, however, this Court had entered an injunction in an action brought by the Delaware Division of Revenue, restraining NORMAR and Steven from transacting business at the Building. The basis for the injunction was that The Smoke Shop had been operating without a valid permit due to nonpayment of its state income and withholding taxes. Two contempt orders were required to enforce that injunction. The contempt order entered on September 7, 1999, directed Steven to abandon the Building and remove all inventory before 5:00 p.m. on September 10, 1999. Steven did not comply with that Order. As a result, the Justice of the Peace Court, at the insistence of the Department of Finance, ordered that the Building be padlocked, with access allowed only to persons approved by that Department.

After much legal wrangling, the Justice of the Peace Court awarded possession of the Building to CMS on November 22, 1999. By then Steven had sold the contents of the Building, which constituted most of NORMAR's assets, to Hyman's Delaware corporation, Moishe, Inc. ("Moishe"), for one dollar ($1). Claire reacted by filing a distress action in the Justice of the Peace Court, to prevent Moishe from selling the marketable inventory, absconding with the proceeds, and then leaving the Building full of unmarketable contents and trash. Claire's distress action resulted in a stipulated Order under which (1) Moishe would auction the contents of the Building at any time before January 31, 2000; (2) the proceeds of the auction (after payment of auction expenses) would be placed into escrow, with counsel for CMS being the escrow agent; (3) up to $25,000 of the proceeds would be distributed to Moishe, and (4) any excess proceeds would be paid to CMS.

The auction took place on January 28, 2000, but no auction proceeds were escrowed. Because the proceeds of the auction were under $5,000, the Justice of the Peace, on March 9, 2000, ordered that Moishe would retain those monies remaining after paying the auctioneer's fees. That Order also required the parties to exchange mutual releases and dismissed the case with prejudice.

After the auction, Claire paid out of her personal funds all unpaid taxes, utility charges, and insurance premiums on the Building. She also paid the Department of Finance judgment that had been entered, including penalties and interest. Although Claire has personally paid all of these costs and other costs incurred to remove the cloud from the Building's title, the Building still cannot be sold until its title is finally cleared of the three remaining encumbrances, specifically, the Kulesza, Benson,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d                                                                 Page 35
(Cite as: 2000 WL 1724234, *3 (Del.Ch.))

and Hyman mortgages. This action was brought primarily to invalidate those mortgages.

## II. THE PARTIES' CONTENTIONS AND THE APPLICABLE STANDARD

*4 On a motion for summary judgment, the Court must consider all the evidence in the light most favorable to the non-moving party and determine whether any material issues of fact remain to be decided. [FN9] The Court also assumes the truth of uncontroverted facts as stated in the record. [FN10] If the moving party shows that there has been a "complete failure of proof on an essential element of a claim" by the non-moving party, the burden shifts to the non-moving party to raise material issues of fact that would preclude summary judgment. [FN11]

> FN9. See Cincinnati Bell Cellular Systems Co. v. Ameritech Mobile Phone Service of Cincinnati, Inc., Del. Ch., C.A. No. 13389, Chandler, V.C., Mem. Op. at 3-4 (Sept. 3, 1996) (requiring that no material issues of fact exist); Oliver B. Cannon & Sons v. Dorr-Oliver, Inc., Del.Super., 312 A.2d 322 (1973) (requiring the court to look at the evidence in a light favoring the non-moving party).

> FN10. Cincinnati Bell, at 4, citing Tanzer v. Int'l Gen. Indus., Inc., Del. Ch., 402 A.2d 382 (1979).

> FN11. See Cincinnati Bell, at 4, citing State v. Regency Group, Inc., Del.Super., 598 A.2d 1123, 1129 (1991).

This motion raises two sets of claims. The first is whether the mortgages executed by Steven in favor of the defendant-mortgagees are valid. The plaintiffs contend that they are not because (i) Steven had no authority to bind the partnership to these mortgages, and (ii) the mortgages were not supported by consideration flowing to CMS or for CMS's benefit. The defendant-mortgagees respond that the mortgages are valid because (i) even if Steven had no actual authority to execute the mortgages on behalf of CMS, he had the apparent authority to do so; and (ii) the mortgages were supported by consideration flowing to CMS.

The second set of claims involves the dissolution and "winding up" of the CMS partnership. The first of this set of claims on which the plaintiffs have moved for summary judgment raises the question of whether CMS has been dissolved. The plaintiffs contend that it has; defendant Hyman argues that that determination cannot be made as a matter of law at the summary judgment stage.

Second, the plaintiffs ask the Court to "adjust" the partnership accounts to reflect the sums that Claire personally expended on the partnership's behalf. Third, the plaintiffs seek an order appointing Claire as the managing partner of CMS, so that she can complete the winding up process without any interference by Steven. Fourth, the plaintiffs seek summary judgment on their claim against Steven and Hyman for slander of title, based on the contention that those defendants intentionally clouded the Building's title. Hyman opposes the motion on the grounds that this claim was not adequately pled in the complaint, and even if it was, the plaintiffs have not supported their slander of title claim factually.

Fifth, and finally, the plaintiffs seek a money judgment in favor of Claire, and against Steven personally, for the monies that Claire was required to pay to purchase the CDB mortgage.

The mortgage validity issues are treated in Section III of this Opinion. The remaining issues are addressed in Section IV.

## III. THE MORTGAGE VALIDITY ISSUES

As earlier noted, the plaintiffs seek the invalidation and cancellation of the mortgages granted by Steven on the Building on two separate grounds. First, the plaintiffs contend that Steven had no authority to execute the mortgages on CMS's behalf. Second, they argue that even if Steven did have such authority, the mortgages are invalid, because no consideration was bargained for or passed to CMS. The defendant-mortgagees respond that, although they were unaware that Steven had no actual authority to bind CMS to the mortgages, they reasonably believed that Steven had authority, for which reason CMS is bound by Steven's acts under the doctrine of apparent authority.

*5 I conclude, for the reasons discussed below, that (i) Steven lacked both actual and apparent authority to bind CMS when he purported to execute the mortgages on CMS's behalf, and (ii) CMS received no consideration for the three mortgages that currently encumber its primary asset, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Building. Accordingly, all three mortgages are determined to be invalid ab initio.

A. Steven's Lack of Authority to Bind CMS to the Mortgages

It is undisputed that the Partnership Agreement prohibited Steven from mortgaging the building without the "prior written unanimous approval of all of the partners." [FN12] It also is undisputed that Claire, as the majority partner, never authorized the mortgages. On that basis alone, the mortgages would normally be invalid as against the partnership and the Building.

> FN12. As earlier stated, the Partnership Agreement prohibited any CMS partner from executing any mortgage on behalf of the partnership without the prior written unanimous approval of all partners. Partnership Agreement, Article 8(d).

The three defendant-mortgagees claim, however, that they did not know that Steven lacked the authority to bind CMS. Moreover, the defendants argue that they had reason to believe that Steven did have the authority to execute the mortgages on CMS's behalf. Specifically, the defendants argue that, because Claire allowed Steven to hold himself out as having the requisite authority to execute the mortgages, those mortgages must be found valid and binding upon CMS under the common law doctrine of apparent authority. At the very least, the defendant-mortgagees contend, a trial is needed to resolve the question of Steven's apparent authority to execute the mortgages.

The issue presented is whether there exists a triable dispute of fact as to whether Steven had the apparent authority to execute the three mortgages on behalf of CMS. Based on the undisputed facts of record, I conclude as a matter of law that Steven did not.

The doctrine of apparent authority operates to bind a principal for acts of its agent in circumstances where the agent had no authority at all. The policy rationale for that seemingly odd result is that, where a principal enables its agent to hold himself out to the public as having the requisite authority, and thereby leads persons dealing with the agent reasonably to believe that agent was authorized, it is fair to hold the principal liable for the agent's unauthorized acts. As between the innocent third party plaintiff and the principal, the law holds that the principal who is in the best position to prevent the agent's wrongful acts should bear the loss. [FN13]

> FN13. See Grand Ventures Inc. v. Whaley, Del.Super., 622 A.2d 655, 664 (1992), aff'd, Del.Supr., 632 A.2d 63 (1993); International Boiler Works Co. v. General Waterworks Corp., Del.Supr., 372 A.2d 176, 177 (1976).

In the general partnership context, the common law doctrine of apparent authority has been codified in the Delaware Uniform Partnership Act (the "DUPA"). Under the DUPA, although agency principles continue to apply, [FN14] a partner has authority to bind the partnership only with respect to acts the partner performs within the ordinary course of the partnership business. [FN15] Thus, the acts of a partner "for apparently carrying on in the usual way the business of the partnership" will bind the partnership, unless the partner "has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing had knowledge of the fact that he has no such authority." [FN16] But, "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." [FN17]

> FN14. See 6 Del. C. § 1504 (stating that in Delaware, agency law principles apply under partnership law).

> FN15. See 6 Del. C. § 1509 (stating that "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners."); Miller v. Gilbert, Del. Ch., C.A. No. 5567, Brown, V.C. Mem. Op. at 18-19 (May 11, 1979); see also 59A Am.Jur.2d Partnership § 250 (1987) (stating that agency law continues to apply under the Uniform Partnership Act); 59A Am.Jur.2d Partnership § 258 (1987) ("the apparent scope of a partnership business primarily depends on the conduct of the partnership and its partners and what they cause third parties to believe about the partners' authority."). In addition, on July 1, 1999, a Revised Delaware Partnership Act went into effect. See 6 Del. C. § 15-1206. Until

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



January 1, 2002, the Revised Act will only govern partnerships formed after July 1, 1999 and partnerships formed before that date which elect, in their partnership agreement, to adopt it. See id. The premise of 6 Del. C. § 1509 has, however, been preserved in the new Delaware Partnership Act. 6 Del. C. § 15-301 of the new Act provides that "an act of a partner which is not apparently for carrying on in the ordinary course of the partnership business, purposes or activities of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners."

FN16. 6 Del. C. § 1509(a).

FN17. 6 Del. C. § 1509(b).

*6 These principles, as applied to the undisputed facts, compel the conclusion that Steven did not have apparent authority to bind CMS to the mortgages.

1. The Mortgages Were Not in the Ordinary Course of CMS's Business

In determining what is "carrying on in the usual way" or "ordinary course," of a partnership's business, the Court may consider the partnership's stated purposes, the precedent set by the partnership's prior "custom or course of dealing" and "the general custom" of analogous partnerships. [FN18] Thus, in a case where the stated purpose of a partnership was to own and operate a building, a contract to compensate a third party for services in finding investors for a partnership, was not "carrying on the business of the partnership" within the meaning of 6 Del. C. § 1509(b). [FN19]

FN18. See 59A Am Jur.2d, Partnership § 264 (1987).

FN19. See Abt v. Harmony Mill Ltd. Partnership, Del. Ch., C.A. No. 12435, Chandler, V.C., Mem. Op. at 6 (Dec. 18, 1992) (holding that remunerating a third party for services in finding investors to fund the partnership was not carrying out the partnership's business).

In this case, the business of CMS was to own and operate the Building. Encumbering the Building to procure funds for unrelated purposes did not fall within the ordinary course of CMS's business. Although mortgaging the Building was included within the stated purposes in CMS's Partnership Agreement, that activity would fall within the ordinary course of CMS's business only if the mortgage proceeds were used to further the business of CMS. Otherwise, Claire's prior approval would be required, which occurred in 1994 when the Building was mortgaged to raise funds to pay a debt of NORMAR.

In this case the mortgage proceeds were not used to further the business of CMS. Rather, the Benson and Kulesza mortgages were executed to secure Steven's personal debt to those mortgagees. And, the Hyman mortgage proceeds went to NORMAR (which did not own the Building), not to CMS (which did). For these reasons, the mortgages cannot be deemed to have been in the "ordinary course" of CMS's business, and are therefore invalid under 6 Del. C. § 1509(b). [FN20]

FN20. That section provides: "An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." In this case, it is clear that Claire did not authorize the execution of the mortgages.

Even if the grant of the mortgages was within the ordinary course of CMS's business, the Benson and Kulesza Mortgages were invalid under 6 Del. C. § 1509(a), because Messrs. Benson and Kulesza knew that Steven lacked the authority to execute the mortgages on the partnership's behalf.

It is an established principle of Delaware law that apparent authority cannot be asserted by a party who knew, at the time of the transaction, that the agent lacked actual authority. [FN21] This Court has held that where a partner executes an obligation for his own personal benefit in the partnership's name, and the payee knows that the partner lacks the authority to act for the partnership, the partnership is not liable on the obligation. [FN22]

FN21. See International Boiler Works Co., 372 A.2d at 177 (requiring that the asserting party "act with 'ordinary prudence and reasonable diligence" ' to ascertain whether the agent is authorized to act on the behalf of the principal).

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



FN22. See Abt v. Harmony Mill Ltd. Partnership, Del. Ch., C.A. No. 12435, Chandler, V.C., Mem. Op. at 6-7, (Dec. 18, 1992); Terry v. Platt, Del, Super., 40 A. 243, 244 (1898).

In this case, all three defendant-mortgagees are attorneys who are versed in the nuances of agency and partnership law. There is, moreover, ample basis in the record to conclude that all three were acquainted with the terms of the CMS partnership agreement in effect at the time their mortgages on the Building were executed. Benson drafted the first two CMS Partnership Agreements, both of which expressly prohibited any CMS partner from lending, spending, or giving any part of the partnership property, or drawing any bill, note, or other security in the name of the partnership without the consent of a majority of the partners. [FN23] The long-standing existence of that clause in the CMS partnership agreements that Benson drafted, precludes Benson from assuming (without making further inquiry) that Steven--a minority partner--was duly authorized to mortgage the Building under the current Partnership Agreement. At the very least, Benson's earlier involvement as the Rudnitskys' lawyer created a duty to inquire of Claire whether she had consented to the mortgage.

FN23. See 1985 Partnership Agreement, Article 10; 1989 Partnership Agreement, Article 10.

*7 Kulesza also had prior exposure to the nature of Steven's partnership authority. Kulesza was an associate in Benson's firm at the time Benson drafted the second CMS partnership agreement. Kulesza had also been a witness to the execution of CMS's latest lease with NORMAR on June 21, 1989. That exposure, coupled with the fact that Steven was using a partnership (CMS) asset to discharge a personal, non-partnership debt, created a similar duty on Kulesza's part to inquire into Steven's authority to bind CMS.

Finally, Hyman, who is also an attorney, can hardly claim unfamiliarity with the CMS Partnership Agreement. Hyman had attended an earlier trial in the Justice of the Peace Court on September 15, 1999. At that trial the propriety of Steven's independent mortgaging of the Building was litigated. In that trial, the current CMS Partnership Agreement was an exhibit [FN24] and in addition, Steven's role as a minority partner was discussed.

[FN25] The plaintiffs cite these facts to show that Hyman had, at the very least, inquiry notice that the Partnership Agreement prevented Steven from executing a mortgage on behalf of CMS without Claire's consent. Hyman argues, nonetheless, that he did not know that Steven lacked authority to execute the Hyman mortgage on November 20, 1999.

FN24. Plaintiff's Opening Brief at 36. Indeed, Claire claims that Hyman was furnished a copy of the current CMS Partnership Agreement at that time. Id. at 19.

FN25. Transcript of Justice of the Peace Trial at 92-93.

Hyman's claim of ignorance that the Partnership Agreement prohibited Steven from validly executing the Hyman Mortgage, although of questionable credibility, raises a triable issue of whether Hyman had inquiry notice of that fact. Inquiry notice "exists where a person has knowledge of such facts as would lead a fair and prudent person using ordinary care to make further inquiries." [FN26] A person who fails to take those further steps is chargeable with whatever knowledge he would have acquired had he taken such steps. [FN27] Whether or not such a duty has arisen in a specific case is ordinarily a question of fact. [FN28] I conclude, although with some reluctance, that with respect to the Hyman mortgage there is a question of material fact that cannot be decided at the summary judgment stage. [FN29]

FN26. 58 Am.Jur.2d Notice § 15 (1987).

FN27. See Amjems, Inc. v. F.R. Orr Constr. Co., Inc., 617 F.Supp 273 (S.D.Fla, 1985).

FN28. 58 Am.Jur.2d Notice § 17 (1987).

FN29. This fact dispute is of no moment, however, because the Hyman mortgage is found invalid because it was not in the ordinary course of CMS's business and because it is unsupported by consideration flowing to CMS.

With respect to the Benson and Kulesza mortgages, there is no triable fact issue. Given their professional and/or personal relationships with the Rudnitskys, and their knowledge of the earlier and/

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



or current partnership agreements, Benson and Kulesza cannot be heard to argue that they had valid reason to believe that Steven had the authority to bind CMS without Claire's consent. Accordingly, I conclude that Steven lacked the apparent authority to act on behalf of CMS in executing the Benson and Kulesza mortgages.

B. The Mortgages Were Not Supported By Consideration Flowing To CMS

Apart from the issue of whether the mortgages were authorized, the plaintiffs contend that all three mortgages--including the Hyman mortgage--are invalid on the separate and independent ground that they were unsupported by consideration flowing to CMS. I agree.

To be enforceable, a mortgage must be supported by mutually-bargained-for consideration. [FN30] Here, the consideration for the mortgages neither flowed to nor benefited CMS. Rather, the consideration flowed to and benefited Steven and NORMAR. At oral argument, Mr. Kulesza conceded that his mortgage was granted to secure Steven's personal legal fee obligation to Kulesza for work Kulesza had done in connection with Steven's divorce proceedings, and also for work Kulesza had done for NORMAR. [FN31] Hyman's mortgage was granted to secure a $25,000 loan to Steven that later became the consideration for the sale of NORMAR's assets to Moishe. [FN32] Finally, Benson's mortgage was granted to secure an obligation to pay legal fees incurred by Steven personally, and by NORMAR, not CMS. [FN33]

> FN30. See Continental Ins. Co. v. Rutledge and Co., Inc., Del. Ch., 750 A.2d 1219, 1232 (2000) (stating that Delaware courts "define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request").

> FN31. Transcript of September 18, 2000 hearing at 70; Defendant Kulesza's Response to Plaintiff's First Request for Admissions, No. 3.

> FN32. Plaintiffs' Opening Brief at 36-37; Hyman Answering Brief at 5. Hyman asserts that the $25,000 was "used to pay off tax obligations of Claire Rudnitsky and Steven Rudnitsky and also, to begin to replace the air conditioner." The CMS-NORMAR lease, however, provides that NORMAR, not CMS, was responsible for taxes and building repair and maintenance.

> FN33. Defendant Benson's Response to Plaintiff's First Request for Admissions, Nos. 15 & 18.

*8 For these reasons, the Court finds that all three mortgages are invalid on the basis that CMS neither received nor bargained for the consideration that was given in exchange for the mortgage.

The invalidity of the mortgages having been established, I next turn to the appropriate remedy.

C. The Appropriate Remedy

1. Cancellation

Plaintiffs argue that a decree canceling the mortgages is a necessary and appropriate remedy. Even though declared invalid, the mortgages, unless canceled, will continue to cloud the Building's title and make the Building difficult to sell. To prevent the transfer of the mortgages to bona fide purchasers for value, the plaintiffs contend that the Benson, Kulesza, and Hyman mortgages must be canceled and removed from the public record by satisfaction or other appropriate means; and that the notes secured by the Benson and Kulesza mortgages must be reformed and re-executed to reflect Steven as the sole obligor.

Defendant Kulesza opposes the cancellation remedy because (he contends) the mortgages were intended to bind only Steven's interest in the partnership. Accordingly, Kulesza argues, the mortgages should remain of record but encumber only Steven's share of the partnership assets.

I cannot agree. Nothing in the mortgage instruments limits their scope to Steven's partnership interest. Without cancellation, CMS will remain exposed to potential liability to any bona fide purchaser for value of the notes and mortgages. Kulesza's argument also fails to give any meaningful effect to the fact that the mortgages have been declared invalid in their entirety.

This Court has recognized that "[c]ancellation is the ordinary remedy in removing clouds [on title]." [FN34] Where a lien or encumbrance on title to real property appears valid on its face but is shown by

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d                                                                                                  Page 40
(Cite as: 2000 WL 1724234, *8 (Del.Ch.))

extrinsic evidence to be void, "a court of equity may intervene and set it aside as a cloud upon the real title to the land." [FN35] Cancellation or equitable rescission has been found appropriate where, "in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required ... [as where] the plaintiff would be exposed to liability to third parties not appearing in the action." [FN36] Indeed, this Court has held that cancellation is "the only remedy that is adequate" in cases where a note may be transferred to a bona fide purchaser "who could then recover from the plaintiff under the note." [FN37]

> FN34. Gregg v. Rowles, Del. Ch., C.A. No 1541-S, Allen, C., Mem. Op. at 4 (Dec. 2, 1992), citing 4 Pomeroy's Equity Jurisprudence 1398 (5th Ed.1941) (stating that cancellation is appropriate where title is clouded).
>
> FN35. Wilkes v. State Highway Dept., Del. Ch., 265 A.2d 421, 423-424 (1970), citations omitted.
>
> FN36. Id; Levinson v. Continental Insurance Services, Inc., C.A. No. 7962, Hartnett, V.C., Mem. Op. at 4 (April 4, 1991), citing E.I. DuPont De Nemours and Co. v. HEM Research, Inc., Del. Ch., C.A. No. 10747, Allen, C., Mem. Op. (October 13, 1989).
>
> FN37. E.I. DuPont De Nemours and Co., at 7, citation omitted; See also Levinson, at 8 (holding the same).

In this case, the Court has found each of the three disputed mortgages to be invalid. The mortgages operate as liens that continue to cloud the Building's title. Absent cancellation, the mortgagees could transfer their notes and mortgages to bona fide purchasers without notice of the invalidity "who could then recover from [plaintiffs] under the note." Cancellation of the Benson, Kulesza, and Hyman Mortgages is the "only remedy that is adequate" to avoid exposing CMS to liability to such potential bona fide purchasers.

*9 Kulesza's argument also ignores the fact that the three mortgages have been declared invalid, as a summary judgment matter, for lack of consideration and for lack of execution authority. For that reason, they are not enforceable even against Steven's interest in the CMS partnership. Accordingly, a decree will be entered canceling all three mortgages and making the cancellation a matter of public record by appropriate recordation.

2. Reformation of the Benson & Kulesza Notes

Plaintiffs acknowledge that, because Steven is legitimately indebted to Benson and Kulesza, it is equitable and just that the notes secured by those mortgages be reformed and re-executed to reflect the fact that Steven is the sole obligor. [FN38]

> FN38. The plaintiffs argue that Hyman is not entitled to reformation of his note because that relief is not necessary to secure Steven's indebtedness to Hyman. Hyman retains two notes, totaling $25,000, that obligate Steven individually. Both are guaranteed by NORMAR. As a result, Hyman already has what reformation is needed to give Benson and Kulesza--a means of collecting the debts owed by Steven.

Reformation allows a court of equity "to make an erroneous instrument express correctly the real agreement between parties." [FN39] That relief is appropriate in cases of fraud, a mutual mistake of both parties to the contract, or the unilateral mistake of one party coupled with knowing silence by the other. [FN40]

> FN39. Colvocoresses v. W.S. Wasserman Co., Del. Ch., 28 A.2d 588, 589 (1942).
>
> FN40. Id.

Steven's execution of the Benson and Kulesza notes on behalf of CMS makes reformation appropriate under either theory. If both Steven and the defendant-mortgagees knew that Steven lacked the authority to execute the notes or to bargain on behalf of CMS, the execution of those notes operated as a fraud on CMS by all the parties thereto. If, on the other hand, only Steven knew that he lacked the authority to act on behalf of CMS, but he allowed the defendant mortgagees to proceed in ignorance of that fact, at the very least the mistake requirement is satisfied. In either even, reformation of the Benson and Kulesza notes to reflect Steven as the sole obligor is warranted.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



I turn next to the second set of claims, which relate to the dissolution and winding up of CMS.

## V. CLAIMS RELATING TO THE WINDING UP OF CMS

A. The Dissolution of the Partnership

Claire first seeks summary judgment under 10 Del. C. § 6501, declaring that the partnership, CMS, was and is dissolved. Defendant Hyman argues that an order of dissolution cannot be granted as a matter of law at the summary judgment stage. He argues that that relief may be granted only after a final hearing. I disagree.

On May 20, 1999, at a duly called partners' meeting, Claire voted her two-thirds partnership interest in favor of dissolution. She was entitled to do that under Article 19(a)(ii) of the Partnership Agreement. [FN41] Once that was done, nothing more was contractually required to dissolve the partnership. Hyman has presented no facts or law that suggest otherwise. The undisputed facts establish that CMS was dissolved as a result of the action taken at the May 20, 1999 partners' meeting, and Claire is entitled to a judgment so declaring.

> FN41. Article 19(a)(ii) reads in relevant part: (a) Dissolution Events. The partnership shall be dissolved only by: (ii) The vote of the partners owning a majority of the capital accounts of the partnership;

B. "Adjustment" of the Capital Accounts

1. The Expenses

The plaintiffs next argue that they are entitled to summary judgment declaring that the capital accounts of CMS should be "adjusted" to credit Claire with the amount of the expenses that she paid personally on behalf of CMS. It is not clear what the plaintiffs mean by "adjust." What is clear is that Claire wants to be reimbursed in some appropriate way for her payments of the CMS debts out of her personal assets. The debts that Claire now claims to have paid personally are set forth in the chart below:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2000 WL 1724234, *9 (Del.Ch.))

Page 42

| Debt Paid by Claire | Amount Paid |
|---|---:|
| (1) Payment of PNC loan to save Building from foreclosure | $52,242.68 |
| (2) New Castle County Real Estate Taxes owed by NORMAR. | $6,683.60 |
| (3) City of Wilmington Real Estate Taxes owed by NORMAR. | $7,330.65 |
| (4) City of Wilmington water & sewer charges owed by NORMAR | $532.99 |
| (5) Paid to the Division of Revenue to release CMS Building from State's judgment for NORMAR withholding taxes. | $979.00 |
| (6) Hazard insurance premiums paid for the Building following lapse in coverage by NORMAR | $9,885.69 |
| TOTAL | $77,654.61 |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*10** In response, the defendants argue that certain of these debts were not debts of CMS and therefore are not reimbursable. That response frames the issue presented.

The PNC loan became a liability of CMS because CMS guaranteed NORMAR's payment of that loan. When NORMAR defaulted on the loan, PNC became entitled to look to CMS as the guarantor and mortgagor, and the Building, as the sole asset of CMS, was put at risk of foreclosure. Claire's payment of that loan was therefore the payment of a liability of CMS.

The taxes paid by Claire stand on the same footing. Although the lease for the Building made the tenant, NORMAR, responsible to pay all taxes, insurance, and utilities, [FN42] the taxing authorities were entitled to look to the owner-lessor (CMS) if the lessee (NORMAR) defaulted. For that reason, when NORMAR did not pay the County taxes, a judgment was entered against CMS as the landowner. Had Claire not paid those taxes, the Building would again have been at risk of foreclosure. [FN43]

> FN42. CMS-NORMAR Lease dated July 21, 1989.
>
> FN43. Praecipe of Dennis J. Siebold, New Castle County Finance Legal Officer, filed with Prothonotary of New Castle County, August 12, 1999. The same is true for the City of Wilmington property taxes and water/sewer charges. By letter dated January 7, 2000 the City informed CMS that if the property taxes and water/sewer charges were not paid immediately, the Building would become subject to a Sheriff Sale. Letter of January 7, 2000 from Aileen Mandigma, Esquire, Assistant City Solicitor, to CMS Associates.

Claire also paid the Delaware Division of Revenue's $9,885.69 judgment, which, she claims, had been entered against CMS as a consequence of NORMAR's failure to pay withholding taxes. Claire did that to release the Building from that judgment and the attendant risk of foreclosure. This claim is problematic, however, because it was not pled in the complaint and was never raised until the plaintiffs' Opening Brief, and also because nothing of record establishes that a judgment was entered against CMS for the NORMAR withholding taxes. What the record does show is that Claire received a tax bill and that she paid $9885.69 to the State of Delaware. But, that bill was sent to Claire addressed in her name, whereas the other bills that she paid were sent to Claire addressed in CMS's name. These gaps in the record preclude a grant of summary judgment to Claire on this claim for reimbursement for her payment of the NORMAR tax bill.

Finally, Claire seeks to recover the insurance premiums she paid to maintain the insurance on the Building. [FN44] Insurance was a contractual obligation of NORMAR under the lease. Despite that, and even though Claire was not required by law to purchase insurance, no reasonable business person would allow the sole asset of her business to go uninsured. Accordingly, although insurance was the contractual responsibility of NORMAR under the lease, once NORMAR (owned by Steven) failed to pay the insurance premiums, Claire properly assumed financial responsibility to protect the Building for the benefit of CMS. On that basis, Claire is entitled to reimbursement of the insurance premiums she paid to maintain in effect the insurance on the Building.

> FN44. On September 20, 1999 Claire paid $586 and on March 23, 2000 she paid $393. These were payments of premiums on a Nationwide policy for the coverage period of October 2, 1999 through October 2, 2000. Plaintiff's Exhibit F.

2. The Mechanics of Reimbursement

Although Claire is entitled to be compensated for some of the payments she made on behalf of CMS, it is not altogether clear by what procedure or mechanic that will be accomplished. The plaintiffs, in their brief, simply ask the Court to enter a judgment declaring that Claire's CMS capital accounts be increased ("adjusted") by the amounts that she expended personally on behalf of the partnership, [FN45] and correspondingly, that Steven's CMS capital account be reduced by those amounts. [FN46] But what the plaintiffs have not explained or shown is the legal basis under the Partnership Agreement or the DUPA for this Court making such an "adjustment." "For this Court to rewrite the Partnership Agreement to alter a partner's ownership interest without any legal basis, would clearly overreach." [FN47]

> FN45. Plaintiffs' Opening Brief at 45.



> FN50. In re Application of Motivational Center Inc., Del. Ch., Mem. Op. at 6, Allen, C. (Nov. 3, 1987) (citing 50 Am.Jur.2d, Libel & Slander § 541).
>
> FN51. For that reason it is premature to consider whether the defendants' slander of title claim merits an award of the costs (including attorney's fees) of securing (i) the cancellation of the Hyman mortgage and its removal from the record, (ii) the cancellation of the note secured by the Hyman Mortgage and of any deed in lieu of foreclosure executed incident to that mortgages, (iii) obtaining possession of the Building in the Justice of the Peace Court, and (iv) forcing the clean-out of the Building by means of the distress sale ordered by the Justice of the Peace Court. Moreover, those costs were not quantified or established.

E. The CDB Mortgage

Lastly, Claire seeks a summary judgment award reimbursing her for the monies she paid to acquire the CDB mortgage. On July 25, 2000, Claire purchased Steven's entire mortgage obligation to CDB. [FN52] In the purchase agreement, CDB assigned to Claire "all of CDB's right, title and interest in and to the original Judgment Note and Mortgage, all of Assignor's (CDB) causes of action (asserted or unasserted) arising therefrom, and the entries of judgment entered in favor of Assignor.... [FN53] As part of that assignment, CDB submitted and certified to Claire the payment history of the loan. That history reflects that no payment has been made on that loan since May 28, 1999. Indeed, before Claire purchased the note, CDB had asserted a cross-claim against Steven for $22,535.19, representing the balance due on CDB's judgment note as of November 5, 1999. Steven did not answer that cross-claim, nor has he disputed the amount of that claim in this action.

> FN52. On October 5, 1998, Steven executed a mortgage against the Building in favor of CDB for $17,000. As with the other three mortgages, this was also done without Claire's knowledge or consent.
>
> FN53. Agreement for Purchase of Lender's Position of July 25, 2000 between CDB and Claire, at 1-2.

The undisputed facts establish that Steven did not have the authority to bind CMS to the CDB mortgage. The issue is whether Claire is entitled to a money judgment against Steven for the amounts presently due and upon which interest will continue to accrue until the debt is paid. I conclude that she is. The mortgage obligates both Steven individually and CMS. As CDB's assignee, Claire has the right to enforce the instrument against Steven. The mortgage obligation is now in default and is enforceable by a judgment note. For that reason Claire is entitled to a money judgment against Steven in the amount of the unpaid principal, plus accrued interest, plus whatever costs of reducing the claim to judgment are made recoverable by the CDB note and mortgage instruments.

VII. CONCLUSION

Counsel for the parties shall confer and submit a form of Order that implements the rulings made in this Opinion.

2000 WL 1724234 (Del.Ch.), 27 Del. J. Corp. L. 706

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



FN46. Amended Complaint at ¶ 4, page 13.

FN47. Cole v. Kershaw, Del. Ch., C.A. No. 13904, Jacobs, V.C., Mem. Op. at 34 (Aug. 15, 2000).

*11 Because "Capital Account" is a term used in the Partnership Agreement, that Agreement is a potential source of authority for a judicially-compelled "adjustment" of a partner's capital account. Unfortunately, however, nothing in the Partnership Agreement authorizes such an adjustment. Section 5 of the Partnership Agreement concerns capital accounts. Subparagraph (c) creates separate capital accounts for each partner and addresses how increases to those accounts can be made in certain circumstances. But, none of the circumstances described in Section (c) is relevant here. Thus, the plaintiffs have not pointed to any provision in the Partnership Agreement that legally authorizes judicial relief in this form.

It appears that what the plaintiffs are truly seeking is a money judgment against Steven for the amount he would have been required to contribute to CMS for the various taxes, insurance, and other charges that Claire was forced to pay out of her own pocket. Thus, the claim is in the nature of equitable indemnification or contribution. If such a money judgment were entered, the plaintiffs could execute on that judgment at law against Steven's personal property, which would include his CMS capital account. The plaintiffs have not sought the entry of a money judgment against Steven on this motion, nor have they advanced a principled legal argument for judicially "adjusting" the Capital Accounts of the partnership. For these reasons, the plaintiffs' current motion for summary judgment granting this specific form of relief must be denied.

C. Winding Up The Partnership Without Steven

The plaintiffs also seek an order permitting Claire, as CMS's controlling partner, to complete the winding up of CMS, including selling the Building, without the participation of Steven. Under the Partnership Agreement, the authority to wind up the affairs of CMS is given to "the partners," [FN48] which would include Steven. The plaintiffs argue that, if Steven is allowed to participate, the winding up process will never succeed, because Article 8(d) of the Partnership Agreement requires the "prior written unanimous approval of all of the partners" for any conveyance of partnership property. The plaintiffs contend that, based on past experience, Steven will consistently refuse to give his approval. Thus, absent an Order from this Court precluding his participation, Steven will make the winding up process an impossibility.

FN48. Partnership Agreement, Article 19(e).

Again, however, the plaintiffs point to no statutory or contractual provision upon which to ground their requested preclusion remedy. Under 6 Del. C. § 15-803, this Court, upon a showing of good cause, may appoint a receiver to wind up a partnership under judicial supervision. But, the plaintiffs do not seek the appointment of a receiver under § 15-803. Moreover, in Paciaroni v. Crane, [FN49] this Court empowered two partners of a three person partnership to wind up the partnership's affairs to the exclusion of the third partner, conditioned upon the posting of a bond. Again, however, the plaintiffs have not grounded their application on that or any other specific legal basis. Because the plaintiffs have not demonstrated a specific legal basis for entitlement to the relief they request, their summary judgment motion must be denied in this respect on the present record.

FN49. Del. Ch., 408 A.2d 946, 957 (1979).

D. Slander of Title

*12 The plaintiffs also seek summary judgment against Hyman and Steven on their claim of slander of title. The elements of a slander of title claim are: "(1) the malicious (2) publication of (3) false matter concerning the state of title of property which (4) causes special damages." [FN50] Because there exist genuine issues of material fact, the record at this stage precludes summary judgment. The plaintiffs claim that Hyman altered or fabricated documents to support the sale of the Smoke Shop assets to Moishe. Hyman contends that the documents were genuine, and that, moreover, Claire was solely responsible for the delay in cleaning out the Building by filing her distress action in the Justice of the Peace Court. Those fact issues must be resolved before the element of "maliciousness" can be determined. If only for that reason, the plaintiffs' motion for summary judgment on their slander of title claim must be denied. [FN51]

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

