IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ST. CLAIR INTELLECTUAL<br>PROPERTY CONSULTANTS, INC., a<br>Michigan corporation,<br><br>Plaintiff,<br><br>v.<br><br>MIRAGE SYSTEMS, INC., a California<br>corporation, GEORGE J. MOUSSALLY,<br>an individual, KENNETH L. FORD, an<br>individual, and EASTMAN KODAK<br>COMPANY, a New Jersey corporation,<br><br>Defendants. | Civil Action No. 05-273 (JJF) |

**SUPPLEMENTAL DECLARATION OF CAREN K. KHOO
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE
ALTERNATIVE, TO STAY, ST. CLAIR'S DECLARATORY JUDGMENT ACTION**

I, Caren K. Khoo, hereby affirm and declare that:

1.     I am an attorney at the firm of Wilmer Cutler Pickering Hale and Dorr LLP,

located at 399 Park Avenue, New York, NY 10022.

2.     I submit this Supplemental Declaration in Support of Defendants' Reply Brief in

Support of Their Motion to Dismiss, or, in the Alternative, to Stay, Plaintiff's Declaratory

Judgment Action.

3.     A true and correct copy of Memorandum Order entered on September 16, 2004 in

St. Clair v. Canon Inc., et al., No. 1-03-CV-00273-JJF, D. Del., is attached to this Declaration as

Exhibit I.

4.      A true and correct copy of the Amended and Supplemental Complaint, filed on June 15, 2005, in the California state action, Mirage v. Speasl *et al.*, No. 1-05-CV-039164, Cal. Super., Santa Clara, is attached to this Declaration as Exhibit J.

5.      A true and correct copy of U.S. Aircraft Ins. Group v. Dwiggins, No. 03-173-SLR, 2004 U.S. Dist. LEXIS 5607 (D. Del. March 31, 2004) is attached to this Declaration as Exhibit K.

6.      A true and correct copy of the Order Re: Motion to Quash for Lack of Personal Jurisdiction, entered on June 28, 2005, in the California state action, Mirage v. Speasl *et al.*, No. 1-05-CV-039164, Cal. Super., Santa Clara, is attached to this Declaration as Exhibit L.

7.      A true and correct copy of the Proof of Service of Summons of Marc K. Roberts executed on June 27, 2005, in the California state action, Mirage v. Speasl *et al.*, No. 1-05-CV-039164, Cal. Super., Santa Clara, is attached to this Declaration as Exhibit M.

Dated: July 13, 2005
New York, NY

_____
Caren K. Khoo

_____
Notary Public

JANINE M. WHITE
Notary Public, State of New York
No. 10WH6112433
Qualified in Manhattan County
Certificate Filed in New York County
Commission Expires: 07/06/2008

- 2 -

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY          :
CONSULTANTS, INC.,                       :
                                         :
         Plaintiff,                      :
                                         :
    v.                                   :    Civil Action No.
                                         :    03-241 JJF
CANON, INC., CANON U.S.A., INC.,         :
FUJI PHOTO FILM CO., LTD,                :
FUJI PHOTO FILM U.S.A., INC.,            :
and FUJIFILM AMERICA, INC.,              :
                                         :
         Defendants.                     :

<u>MEMORANDUM ORDER</u>

Presently before the Court is the Canon defendants' Motion
To Dismiss For Lack Of Standing And Subject Matter Jurisdiction
(D.I. 612). For the reasons discussed below, the Canon
defendants' motion will be denied.

### BACKGROUND

This is a patent infringement case in which St. Clair
Intellectual Property Consultants, Inc.'s ("St. Clair") is
seeking a reasonable royalty from Canon, Inc. and Canon U.S.A.,
Inc. (collectively, "Canon") for their infringement of St.
Clair's digital camera patents, U.S. Patent Nos. 5,138,459 (the
'459 patent), 6,094,219 (the '219 patent), 6,233,010 (the '010
patent), and 6,323,899 (the '899 patent). In the instant Motion,
Canon moves to dismiss for lack of standing and lack of subject
matter jurisdiction.

PARTIES' CONTENTIONS

Canon contends that St. Clair lacks standing to bring suit because Mirage Systems, Inc. ("Mirage"), a former employer of the three named inventors, is the true owner of the patents-in-suit. Canon contends this is so because each of the named inventors signed an employment agreement with Mirage in which he assigned his rights in the inventions to Mirage. Thus, when St. Clair purchased the patents from Personal Computer Cameras ("PCC"), a company formed by the named inventors, no ownership interest was transferred to St. Clair.

St. Clair responds that it owns the patents-in-suit for three reasons. First, it owns the patents because the invention falls under the Safe Harbor of California Labor Code Section 2870, as recited in the inventors' employment agreements. Second, St. Clair claims it is the legal titleholder of the patents because Mirage's employment agreements did not convey legal title to Mirage. This is so because the agreements were adhesion contracts that, at most, created an obligation to assign inventions to Mirage. Furthermore, St. Clair argues that Canon should not be allowed to assert equitable rights on behalf of Mirage. Third, St. Clair claims to be the legal titleholder of the patents because, pursuant to 35 U.S. C. § 261, it is a bona fide purchaser of the patents for valuable consideration, without notice of any prior claim to title.

2

## DISCUSSION

The Court will treat the Motion as a challenge to the subject matter jurisdiction of the Court. See Fed. R. Civ. P. 12(b)(1). When analyzing a facial attack to subject matter jurisdiction, the court will construe a plaintiff's allegations as true, and will not look beyond the face of the complaint to determine jurisdiction. Mortenson v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

The patent recording statute, 35 U.S.C. § 261, voids any assignment against any subsequent purchaser for valuable consideration, "unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase...." 35 U.S.C. § 261. In Filmtec Corp v. Allied-Signal, Inc., 939 F.2d 1568 (Fed. Cir. 1991), the Federal Circuit commented that § 261 "provides that the bona fide purchaser for value cuts off the rights of a prior assignee who has failed to record the prior assignment in the Patent and Trademark Office by the dates specified in the statute."

Whether Mirage is a prior assignee and whether St.Clair is a subsequent assignee that purchased the patents-in-suit for valuable consideration and without notice are fact sensitive questions. As the Court cannot resolve fact sensitive issues at this juncture, it finds that St. Clair has made sufficient allegations to avoid dismissal. This is so because St. Clair has

3

established that it is the titleholder of record in the United
States Patent and Trademark Office.

### CONCLUSION

The Court concludes that dismissal is inappropriate at this
time.  Accordingly, Canon's Motion To Dismiss For Lack Of
Standing And Subject Matter Jurisdiction (D.I. 612) is <u>DENIED</u>.

September 16, 2004
DATE

UNITED STATES DISTRICT JUDGE

4

# EXHIBIT J

1 | Daniel S. Mount, Esq. (State Bar No. 77517)
Justin T. Beck, Esq. (State Bar No. 53138)
2 | Ron C. Finley, Esq. (State Bar No. 200549)
MOUNT & STOELKER, P.C.
3 | 333 West San Carlos
RiverPark Tower, 17th Floor
4 | San Jose CA 95110-2726
Phone: (408) 279-7000
5 | Fax:    (408) 998-1473

6 | Attorneys for Plaintiff ~~BS~~
~~EASTMAN KODAK COMPANY~~
7 | MIRAGE SYSTEMS, INC.

ENDORSED

2005 JUN 15 PM 0: 00

SU_____
CO. OF _____ F CA.
BY_____ _____ PUTY

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SANTA CLARA

9 |

10 | MIRAGE SYSTEMS, INC. ~~BS~~
~~EASTMAN KODAK COMPANY, a New~~
~~Jersey corporation,~~
11 | Plaintiff,

12 | vs.

13 | JERRY A. SPEASL, an individual, MARC K.
ROBERTS, an individual, MATTHEW K.
14 | CHIKOSKY, an individual, ST. CLAIR
INTELLECTUAL PROPERTY
15 | CONSULTANTS, INC., a Michigan
corporation, and DOES 1 to 50.
16 |
Defendants.
17 |

CASE NO. 1-05-CV-039164

**AMENDED AND SUPPLEMENTAL
COMPLAINT FOR DECLARATORY
RELIEF, DAMAGES, RESTITUTION,
DISGORGEMENT OF PROFITS AND
INJUNCTIVE RELIEF**

Unlimited Jurisdiction

18 |

19 |

20 | Plaintiff ~~EASTMAN KODAK COMPANY ("Eastman Kodak")~~ MIRAGE SYSTEMS, INC. ("MIRAGE") ~~BS~~ by its attorneys, for its

21 | Amended and Supplemental Complaint against Defendants JERRY A. SPEASL, MARC K.

22 | ROBERTS, MATTHEW K. CHIKOSKY, ST. CLAIR INTELLECTUAL PROPERTY

23 | CONSULTANTS, INC., and DOES 1 to 50, alleges as follows:

24 | <u>NATURE OF THE ACTION</u>

25 | 1.    This is an action in law and equity for the judicial declaration of ownership of and

26 | quiet title to intellectual property — six patents — belonging to ~~Eastman Kodak~~ MIRAGE ~~BS~~; for damages and

27 | injunctive relief from the unlawful conversion of ~~Eastman Kodak~~ MIRAGE ~~BS~~'s patents, fraud, unfair

28 | competition, tortious interference of prospective business opportunity and advantage, and for

1    disgorgement of unjustly gained profits.

2        2.    The six patents at issue are: U.S. Patent Nos. 5,138,459 ("the '459 patent"); 5,576,757

3    ("the '757 Patent"); 6,094,219 ("the '219 Patent"); 6,233,010 ("the '010 Patent"); 6,323,899 ("the

4    '899 Patent"); and 6,496,222 ("the '222 Patent") (collectively, "the Roberts Patents").

5    <u>**THE PARTIES**</u>

6        3.    Plaintiff ~~Eastman Kodak~~ MIRAGE is a corporation organized and existing under the laws of the

7    State of ~~New Jersey, having a principal place of business at 343 State Street, Rochester, New York~~

8    ~~14650.~~ California .

9        4.    Upon information and belief, Defendant Jerry A. Speasl ("Speasl") is an individual

10    residing at 4172 Grant Court, Pleasanton, California 94566-7537.

11        5.    Upon information and belief, Defendant Marc K. Roberts ("Roberts") is an individual

12    residing at 497 Cape Alan Drive, Henderson, Nevada 89052.

13        6.    Upon information and belief, Defendant Matthew K. Chikosky ("Chikosky") is an

14    individual residing at 4381 Whippoorwill Drive, Hermitage, Pennsylvania, 16148-3253.

15        7.    Upon information and belief, Defendant St. Clair Intellectual Property Consultants,

16    Inc. ("St. Clair") is a corporation organized and existing under the laws of Michigan, having its

17    principal place of business at 10 Stratford Place, Grosse Pointe, Michigan 48230.

18        8.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

19    Does 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff

20    will amend this Complaint to allege their true names and capacities when ascertained.

21        9.    Upon information and belief, each Defendant is responsible in some manner for the

22    occurrences herein alleged, and Plaintiff's damages as herein alleged were proximately caused by

23    such Defendants.

24    <u>**JURISDICTION AND VENUE**</u>

25        10.    This Court has jurisdiction over this action, the allegations of harms which took place

26    in and the claims of which arose in the State of California and County of Santa Clara.

27        11.    The Court has personal jurisdiction over all Defendants pursuant to Cal. Code. Civ.

28    Proc. § 410.10 because the relevant events, transactions and occurrences giving rise to the claims in

1  this Amended Complaint occurred in the State of California, County of Santa Clara.

2       12.    Speasl, Roberts and Chikosky each submitted to the jurisdiction of this Court when

3  they signed their Employment Agreements with Mirage Systems, Inc. ("Mirage") and agreed that

4  any dispute arising thereof be governed by California law.

5       13.    Venue is proper in this State and County.

### EASTMAN KODAK'S PURCHASE OF MIRAGE'S RIGHTS IN THE ROBERTS PATENTS

8       14.    On May 20, 2005, Eastman Kodak entered into an Asset Purchase Agreement with

9  Mirage Systems, Inc. ("Mirage"). Pursuant to this agreement, Eastman Kodak agreed, subject to

10  certain terms and conditions, to purchase from Mirage certain Intellectual Property Rights. These

11  Intellectual Property Rights consist of (i) the Roberts Patents and all technology related thereto or

12  disclosed therein; (ii) all other technology developed, conceived, invented or discovered by Speasl,

13  Roberts or Chikosky during or in connection with their employment by Mirage; (iii) all invention

14  disclosures, patents, patent applications, utility models, right of priority and other rights of Mirage

15  relating to or arising from the items described in (i) and (ii) or claiming priority from any application

16  from which such items claim priority; (iv) all continuations, continuations-in-part, divisions,

17  reexaminations and reissues of any of the items described in (i) to (iii) above which are pending, or

18  subsequently filed in connection with any of the foregoing; (v) all foreign counterparts and

19  corresponding rights relating to each of the foregoing; and (vi) all rights to assert and bring claims in

20  respect of the foregoing, including the right to sue for past infringements, whether now existing or

21  arising in the future.

22       15.    Pursuant to the Asset Purchase Agreement, Kodak purchased the Intellectual Property

23  from Mirage for valuable consideration on June 10, 2005, close of business West Coast time.

24       16.    Eastman Kodak now stands as the successor-in-interest of Mirage as Plaintiff in this

25  action.

### THE BUSINESS OF MIRAGE SYSTEMS

27       17.    Mirage is a company organized and existing under the laws of the State of California,

28  doing business in the City of Sunnyvale, County of Santa Clara, State of California.

18.    Mirage was founded in 1982 to develop cutting-edge electronics in the defense arena. In the '80s, nearly all of Mirage's business involved classified projects for the United States Department of Defense, developing defense electronics and applications.

19.    Throughout the company's existence, part of Mirage's core technology has been designing and developing radar systems and compact, miniaturized electronics, including analog-to-digital ("A/D") converters and processors, which have diverse applications. In the '80s, such applications included, for example, surveillance and electronic countermeasures ("ECM") for use by the United States against the Soviet Union during the Cold War.

20.    Before the Berlin Wall fell in November 1989, Mirage, anticipating the end of the Cold War, began reorganizing its business to expand beyond defense and military applications.

21.    As part of those efforts, Mirage sought new markets and commercial applications for its core technologies and technical capabilities, and created new divisions and hired individuals to find and develop those opportunities.

**SPEASL, ROBERTS AND CHIKOSKY'S EMPLOYMENT WITH MIRAGE**

22.    One of the individuals Mirage hired was Defendant Jerry Speasl. In May 1987, Mirage extended Speasl an offer to join Mirage in a key senior position on its Management Team as Director of Business Development. After negotiations over compensation and benefits, Speasl entered a written Employment Agreement for adequate consideration with Mirage on July 7, 1987, having an effective date of June 29, 1987.

23.    Mirage hired Speasl to, among other things, develop and expand Mirage's existing market base of programs by penetrating further into existing client organizations and program offices; to explore, assess and develop new markets by establishing new client contacts, and by identifying new programs that could benefit from Mirage products, services and capabilities; and to participate with senior management in operational planning and strategic planning related to the Mirage's growth as a company.

24.    One of the new divisions Mirage created in early 1989 for business development was the Communications, Command, Control and Intelligence Systems Division ("C3I"), which was created to explore and exploit new business opportunities relating to surveillance, reconnaissance

1    and intelligence technology for military and commercial applications.  Mirage opened a Vienna,

2    Virginia, office for C3I's operations to keep it close to governmental contacts and potential

3    customers.

4         25.    On March 27, 1989, Mirage's Board of Directors appointed Speasl an officer of the

5    company, Vice President of Business Development.  On June 28, 1989, Speasl became Vice

6    President of the C3I Systems Division, maintaining his position as an officer of Mirage.

7         26.    Foremost in Speasl's job duties, regardless of title, was business development —

8    identifying and pursuing new markets and applications for Mirage's existing technology to grow and

9    for Mirage to develop new technology.

10        27.    Speasl received a performance-based compensation package in which part of his

11   compensation was tied to the amount of new business he developed for Mirage as part of an

12   Incentive Stock Option Plan.

13        28.    Mirage hired more business development people to support Speasl, including

14   Defendant Marc Roberts on March 23, 1989, as Director of Business Development of C3I Systems,

15   and Defendant Matthew Chikosky on August 28, 1989, as Manager of Special Projects Engineering

16   in C3I.

17        29.    Both Roberts and Chikosky reported to Speasl and, like Speasl, both signed

18   Employment Agreements for adequate consideration with Mirage and were primarily responsible for

19   business development.  Both Roberts and Chikosky also received Incentive Stock Option Plans tied

20   to the amount of business they each generated for Mirage.

21   **SPEASL, ROBERTS AND CHIKOSKY'S FIDUCIARY DUTIES TO MIRAGE**

22        30.    Speasl, Roberts and Chikosky's Employment Agreements are substantially identical.

23   Each of Speasl, Roberts and Chikosky's Employment Agreements created a special duty of trust and

24   confidence between each employee and Mirage, in that each represented and agreed that

25   employment by Mirage created a fiduciary relationship with and duty to Mirage, in that:

26              . . . my employment by MIRAGE creates a relationship of confidence
                and trust between myself and MIRAGE with respect to any
27              information of a proprietary nature that I may become aware of during
                the period of my employment by MIRAGE and which a) relates to the
28              business of MIRAGE or to the business of any customer or supplier of
                MIRAGE, or b) has been created, discovered or developed by, or has

otherwise become known to MIRAGE, and has commercial value in the business in which MIRAGE is engaged (hereinafter called "Proprietary Information"). By way of illustration but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, strategies, forecasts, and customer lists.

31. Each Employment Agreement contains a provision requiring the employee to disclose to Mirage any Proprietary Information, including without limitation inventions, trade secrets, marketing plans and customer lists, he made or learned of during his employment. In particular, as part of this fiduciary relationship with and duty to Mirage, each of Speasl, Roberts and Chikosky represented and agreed that:

> I will promptly disclose in confidence to Mirage or any persons designated by it all inventions, improvements, original works of authorship, formulas, processes, computer programs, techniques, know-how and data, whether or not patentable or copyrightable, made or conceived of first reduced to practice or learned by me either alone or jointly with others during the period of my employment (hereinafter collectively called "Inventions").

32. The nature of Mirage's classified work also created a fiduciary duty, including the duties of candor, loyalty, full disclosure, good faith and fair dealing, individually in Speasl, Roberts and Chikosky to Mirage, just as it did for all of Mirage's employees and officers. Many of Mirage's projects were classified and top-secret, and the identity and details of such projects could not be disclosed to those outside of the project. As a result, not only did Mirage have a reasonable expectation that Speasl, Roberts and Chikosky, as well as all of its other employees and officers, would act on the company's behalf, especially in matters involving business development, but Mirage required its employees to act on its behalf.

33. The scope of each of Speasl, Roberts and Chikosky's job duties also created fiduciary duties because each was charged with developing business, markets and applications for Mirage and Mirage alone. Speasl, moreover, was an officer of Mirage, which created a fiduciary obligation in him to represent the company's interests above his own. This fiduciary relationship of trust and confidence created by the nature of Mirage's business was reinforced by Paragraph 13 of the Nondisclosure Agreement, where Speasl, Roberts and Chikosky each further warranted his understanding that the "obligation to protect MIRAGE Proprietary Information as specified in this

1  agreement is separate and in addition to any requirement for the protection of U.S. Defense

2  Department classified information that may be required during and after my employment with

3  MIRAGE."

4  **SPEASL, ROBERTS AND CHIKOSKY'S ASSIGNMENT OF INVENTION RIGHTS**

5      34.    As part of their Employment Agreements, Speasl, Roberts and Chikosky each signed

6  an Exhibit B, an "Agreement Regarding Nondisclosure of Proprietary Information" ("Nondisclosure

7  Agreement"). For consideration of their employment and continued employment with Mirage,

8  Speasl, Roberts and Chikosky each represented and agreed that he understood:

9          . . . that MIRAGE is engaged in a continuous program of research,
           development, production, and marketing with respect to its present and
10         future products [; and]

11     35.    Each Employment Agreement also contained an Exhibit C, which gives the employee

12  the opportunity to exclude inventions that the employee wishes to exclude from the terms of the

13  Employment Agreement.

14     36.    Upon joining Mirage, Speasl and Chikosky each represented that he had no

15  inventions to exclude from the operation of the Employment Agreement by signing Exhibit C.

16     37.    Roberts listed three inventions on Exhibit C that he wished to exclude from operation

17  of the Employment Agreement. The inventions listed by Roberts are unrelated to the Roberts

18  Patents or the subject matter thereof.

19     38.    Speasl, Roberts and Chikosky also represented and agreed that "[a]ll Proprietary

20  Information [including inventions, marketing plans and customer lists] shall be the sole property of

21  MIRAGE and its assigns."

22     39.    Each Employment Agreement further vested in Mirage all rights to any Proprietary

23  Information and inventions made or learned of by the employee during his employment. Speasl,

24  Roberts and Chikosky each specifically assigned any future rights in Proprietary Information

25  (including inventions) to Mirage, representing and agreeing:

26         I hereby assign to MIRAGE any rights I may have or acquire to all
           Proprietary Information. I will keep in confidence and trust all
27         Proprietary Information at all times, both during my employment and
           after its termination, and I will not use or disclose any Proprietary
28         Information without the written consent of MIRAGE except as may be

1    necessary in the ordinary course of performing my duties as an
2    employee of MIRAGE. . . .

3    I agree that all such Inventions which MIRAGE in its sole discretion
     determines to be related to or useful in the business or research or
     development of MIRAGE, or which result from work performed by
4    me for MIRAGE, shall be the sole and exclusive property of MIRAGE
     and its assigns and MIRAGE shall have the right to use and/or to apply
5    for patents . . . for such inventions in any or all countries. . . .

6    40.    The Employment Agreements notified each of Speasl, Roberts and Chikosky that

7    Mirage did not claim inventions that qualified fully under the provisions of Section 2870 of the

8    California Labor Code, which are inventions:

9    for which no equipment, supplies, facility, or trade secret information
     of the Employer was used and which was developed entirely on the
10   employee's own time, and (a) which does not relate (1) to the business
     of the employer or (2) to the employer's actual or demonstrably
11   anticipated research or development, or (b) which does not result from
     any work performed by the employee for the employer.
12

13   41.    In addition to making present assignments of their rights in any invention developed

14   while at Mirage, Speasl, Roberts and Chikosky each agreed that while he was employed by Mirage,

15   he would "not engage in any employment or activity of any business other than for MIRAGE in

16   which MIRAGE is now or may hereinafter become engaged without written consent from

17   MIRAGE."

18   42.    Upon termination or departure from Mirage, the Employment Agreements also

19   required the employee to "promptly deliver to Mirage all documents and data of any nature

20   containing Proprietary Information" and to warrant and represent that he would "not take with [him]

21   any such documents or data or any reproductions thereof."

22   43.    Mirage satisfied and performed all of its duties under the Employment Agreements.

23   **SPEASL, ROBERTS AND CHIKOSKY'S SELF-DEALING**

24   44.    C3I was located in Virginia, across the country from Mirage's headquarters in

25   California. Speasl, Roberts and Chikosky had the authority to control and actually controlled C3I's

26   day-to-day operations.

27   45.    In 1989 and 1990, Speasl, Roberts and Chikosky pursued such business opportunities

28   as incorporating Mirage's miniature electronics technology into unmanned aerial vehicles ("UAVs")

1    and by making presentations to a variety of potential military and commercial customers.

2    46.    Mirage trusted that Speasl, Roberts and Chikosky, at C3I, were conducting business

3    on Mirage's behalf and not their own.

4    47.    Upon information and belief, Chikosky, in his capacity as a Mirage employee, met

5    with representatives of a potential Mirage customer in the Fall of 1989.  At that meeting, the Mirage

6    customer described to Chikosky some UAVs it had built and some features it wished to incorporate

7    into future UAV designs.  Those desired features included a digital camera for taking photographs in

8    military and commercial applications.

9    48.    Upon information and belief, that Mirage customer also informed Chikosky, during

10    this meeting to develop Mirage business, that all existing cameras it had investigated were

11    inadequate and that a new digital camera would have to be developed.

12    49.    Upon information and belief, Chikosky discussed this new digital camera idea, which

13    he had learned of in his capacity as a Mirage employee, in a meeting with Speasl and Roberts shortly

14    after his meeting with the potential Mirage customer in the Fall of 1989.

15    50.    Upon information and belief, Chikosky informed Speasl and Roberts of the

16    specifications and digital camera need the Mirage customer had described to him during the Mirage

17    business development meeting.

18    51.    Speasl, Roberts and Chikosky did not inform Mirage of the customer's request to

19    equip a UAV with a camera.

20    52.    Upon information and belief, in the course of making presentations to prospective and

21    existing Mirage customers in 1989, Speasl, Roberts and Chikosky also found that their digital

22    camera idea could be useful for including photographs in marketing and other presentations in the

23    course of their work for Mirage.

24    53.    Upon information and belief, between the Fall of 1989 and November 20, 1990,

25    Speasl, Roberts and Chikosky (collectively, the "Inventors") developed the digital camera idea into a

26    viable invention, using Mirage resources and on Mirage's time.

27    54.    Upon information and belief, in June 1990, in developing the digital camera idea

28    obtained from the Mirage customer, the Inventors drafted a Business Plan for a digital camera and an

1  A/D image converter.

2      55.    Upon information and belief, the Inventors identified potential new market areas for

3  the digital camera and A/D image converter, including traffic control, disaster

4  preparedness/monitoring, law enforcement, security and intelligence, and projected that revenues for

5  their products would climb from the millions to the tens of millions of dollars from 1990 to 1994.

6      56.    Despite having knowledge of Mirage's core technology in miniaturized A/D

7  processing technology for application in surveillance, intelligence and monitoring applications, the

8  Inventors did not inform Mirage of their identification of the digital camera and A/D image

9  converter potential markets and business expansion opportunities.

10      57.    Both Speasl and Roberts participated in Mirage's identification and pursuit of

11  potential acquisitions during Board meetings of Mirage.  Despite having knowledge of Mirage's

12  efforts to reorganize its business to expand beyond defense and military applications by seeking new

13  markets, neither Speasl nor Roberts informed Mirage of their identification of the digital camera and

14  A/D image converter potential markets and business expansion opportunities.

15      58.    The Inventors never informed Mirage of any of their work on or business plans for

16  the digital camera invention.

17      59.    Upon information and belief, on November 19, 1990, one or more of the Inventors

18  caused the incorporation of Personal Computer Cameras, Inc. ("PCC") in the Commonwealth of

19  Virginia which is now a terminated corporation.

20      60.    The Inventors never informed Mirage of the existence of or their involvement in PCC

21  to Mirage.

22      61.    The Inventors were principals of PCC.  All knowledge held and obtained by any or all

23  of the Inventors regarding the acts alleged below are imputed to PCC.

24      62.    On November 20, 1990, one day after PCC's incorporation, the Inventors applied for

25  a patent on the digital camera invention in the United States Patent and Trademark Office ("PTO").

26  The PTO kept the application secret and did not disclose its existence to the public, as was the

27  PTO's policy and practice at that time.

28      63.    The Inventors never disclosed to Mirage that they had applied for a patent.

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and    10
Injunctive Relief – Case No. 1-05-CV-031964

1     64.    By 1991, under Speasl, Roberts and Chikosky's leadership, C3I had failed to

2 establish sustainable new business opportunities for Mirage.

3     65.    In August 1991, Speasl resigned from Mirage.

4     66.    During his exit interview process, Speasl reaffirmed to Mirage that he had no

5 inventions to exclude from operation of his Employment Agreement.

6     67.    On December 20, 1991, Chikosky made an assignment of any patent rights arising

7 from the November 20, 1990, patent application to PCC.

8     68.    On December 27, 1991, Speasl and Roberts made an assignment of any patent rights

9 arising from the November 20, 1990, patent application to PCC.

10     69.    The Inventors submitted the assignment papers to the PTO on January 8, 1992.

11     70.    The Inventors never disclosed the assignments or PTO submission to Mirage.

12     71.    On January 31, 1992, Roberts resigned from Mirage.

13     72.    During his exit process, Roberts reaffirmed to Mirage that he had no inventions, save

14 the three inventions unrelated to digital camera technology that he had listed on joining the

15 company, to exclude from operation of his Employment Agreement.

16     73.    On August 11, 1992, the '459 patent, titled "Electronic still video camera with direct

17 personal computer (PC) compatible digital format output" issued on the Inventors' November 20,

18 1990, patent application.

19     74.    None of the Inventors obtained Mirage's consent to perform any of the development

20 or commercialization work alleged above for the digital camera invention.

21     75.    During the time of the Inventors' employment, Mirage was involved in various

22 projects in which a digital camera would have been complementary.  For example, starting no later

23 than 1991, Mirage began pursing and ultimately was involved in a project relating to the study of

24 digital images on computers and modifying those images.

25     76.    In 1992, Mirage began developing its business opportunities and applying its

26 technical capabilities to the field of traffic surveillance and management.  For example, Mirage

27 conducted research into machine vision, involving optics and radar detection, to control and direct

28 the flow of traffic.

77.    Mirage eventually obtained unclassified contracts to work for various agencies to develop its traffic monitoring technology, including the Federal Highway Administration.

78.    By 1994 or 1995, while Chikosky was still employed by Mirage, Mirage had developed a traffic monitoring system that used both radar and a compact digital video camera to monitor and report on traffic flow.

79.    The digital video camera was only one feature of this overall project.  As digital video cameras were commercially available and suitable for this project, Mirage did not pursue developing a digital video camera.

80.    The traffic monitoring system project was not classified, and was an open, active project for Mirage.  Upon information and belief, Chikosky provided support to the traffic monitoring system project.

81.    In addition, Chikosky was the key individual instrumental in obtaining and supporting a major classified contract (Project 9199) for Mirage, which initiated on or about January 15, 1992, and extended through approximately December 31, 1998.  During the course of this project, Mirage's California facility provided both hardware and software to an agency of the U.S. Government headquartered on the east coast of the U.S.  As part of the project, Mirage analyzed and processed digital imagery in a variety of picture formats (such as JPEG and BMP formats) using image processing software such as Adobe's Photoshop.

82.    Chikosky, who was employed by Mirage through 1996, did not disclose the '459 patent to Mirage at any time at or before November 2003.

83.    In the course of developing its traffic monitoring system, Mirage conducted a survey of digital cameras and concluded that commercially available cameras would be suitable for the project needs, and that Mirage would not have to develop any specialized equipment in that area.

84.    The Inventors failed to alert Mirage to the digital camera invention and patents on the same at any time, even when such an invention would have direct application to Mirage's existing projects.

85.    Mirage, trusting its fiduciary relationship with the Inventors, was not informed about and did not know of the '459 patent, any of the circumstances leading to the digital camera invention

1  or patent application or the Inventors' breaches of their Employment Agreements and fiduciary

2  duties, and had no reason to doubt the Inventors' representations, at any time before November

3  2003, at the earliest.

4      86.     The application for the '459 patent is the parent of applications for several other U.S.

5  patents, including the '757 patent; the '219 patent; the '010 patent; the '899 patent; and the '222

6  patent (collectively, "the Roberts Patents").

7      <u>**ST. CLAIR'S INVOLVEMENT WITH THE ROBERTS PATENTS**</u>

8      87.     Upon information and belief, in the Fall of 1990, while the Inventors were still

9  employed by Mirage, they employed Paul Fish ("Fish"), a registered patent attorney, to represent

10  them before the PTO and file their patent application.

11      88.     Upon information and belief, in the Fall of 1990, Fish approached Edmund Chung

12  ("Chung") on behalf of the Inventors to explore a business opportunity with a potential licensee or

13  partner for PCC regarding the '459 patent.

14      89.     Upon information and belief, in the Fall of 1990, Chung was a principal of St. Clair.

15  All knowledge held and obtained by Chung regarding the acts alleged below is imputed to St. Clair.

16      90.     Upon information and belief, at least as early as the Fall of 1990, Chung and St. Clair

17  were experienced in dealing with corporations, patents and intellectual property transactions.

18      91.     Upon information and belief, in the Fall of 1990, one or more of the Inventors

19  exchanged communication with Chung, including faxing him a letter for review from Mirage's

20  Virginia C3I office by using a Mirage company facsimile machine and a Mirage company telephone

21  number, (703) 821-4005.

22      92.     Mirage paid for the office rent and operations of the C3I Virginia office, including

23  facsimile and telephone equipment and communications (e.g., telephone) bills for the Virginia

24  office.

25      93.     Upon information and belief, in his communications with Chung, Speasl provided his

26  Mirage company telephone number, (703) 821-4000 for Chung to contact him.

27      94.     Mirage paid for the (703) 821-4000 and (703) 821-4005 telephone numbers for

28  Mirage's Virginia C3I office.

95.    Upon information and belief, Chung and St. Clair knew that the Inventors were employees of Mirage when he spoke with one or more of them in the Fall of 1990.

96.    Upon information and belief, as early as the Fall of 1990, Chung and St. Clair knew that the Inventors had conceived of, developed, and reduced to practice the digital camera invention while employed by Mirage.

97.    Upon information and belief, as early as the Fall of 1990, Chung and St. Clair were actually aware of PCC's defective ownership claim over the '459 patent and the Inventors' lack of rights to the digital camera invention.

98.    Upon information and belief, at least as early as the Fall of 1990, Chung and St. Clair knew that Mirage owned all right and title to the invention developed by the Inventors and the '459 patent application.

99.    Upon information and belief, despite knowing that PCC had no rights in the '459 patent application, St. Clair provided investment capital to PCC on or about May 1992.

100.    Upon information and belief, at around the same time that St. Clair provided funds to PCC and despite knowing that PCC had no rights in the '459 patent application, Chung took a seat on the Board of Directors of PCC.

101.    Upon information and belief, as early as around May 1992, Chung and St. Clair had actual notice of the Inventors' Employment Agreements with Mirage and a duty to investigate PCC's claim of title to the '459 patent application.

102.    Upon information and belief, knowing of PCC's defective title, St. Clair offered to purchase the Roberts Patents from PCC in the Summer of 1995.

103.    Upon information and belief, St. Clair, knowing of PCC's defective title, asked PCC to represent and warrant that PCC owned the Roberts Patents.

104.    Upon information and belief, St. Clair, as an experienced party in the transaction, was on notice that PCC did not own the Roberts Patents because the Inventors had assigned their rights to Mirage through operation of their Employment Agreements, but chose not to perform adequate diligence into PCC's warranty of ownership during St. Clair's due diligence.

105.   Upon information and belief, St. Clair failed to investigate PCC's warranty of ownership because it did not want to confirm that PCC did not own the Roberts Patents, and wanted to be able to falsely represent that it owned the Roberts Patents.

106.   Upon information and belief, the purchase agreement between St. Clair and PCC provides that St. Clair and PCC will equally divide any revenue generated from the Roberts Patents, including damages awards in patent infringement suits.

107.   Upon information and belief, after the purchase, St. Clair had no good faith belief that it owned the Roberts Patents.

108.   Upon information and belief, after the purchase, St. Clair falsely represented to the world that St. Clair owned the Roberts Patents.

### ST. CLAIR'S BAD-FAITH LITIGATION

109.   Upon information and belief, St. Clair does not make, use or sell any products or processes.

110.   Upon information and belief St. Clair's primary business includes licensing and enforcing patents against third parties.

111.   Upon information and belief, starting no later than August 2001, St. Clair arranged and attended business meetings with third parties in California as part of its ordinary conduct of business, during which it claimed to own the Roberts Patents.

112.   Upon information and belief, during those meetings in California, St. Clair accused those and other third parties of infringing the Roberts Patents and attempted to license the Roberts Patents to such third parties or otherwise derive benefit from the Roberts Patents by representing itself to be the owner of the Roberts Patents.

113.   By those acts, St. Clair knowingly falsely represented to one or more third parties that it owned rights in the Roberts Patents and disparaged Mirage's title to the Roberts Patents and the subject matter thereof.

114.   Upon information and belief, St. Clair has filed the following patent infringement lawsuits in the U.S. District Court for the District of Delaware: (1) *St. Clair Intellectual Property Consultants, Inc. v. Sony Corp. et al.*, No. 01-CV-557 (JJF), on August 14, 2001 ("the *Sony*

1    Action"); (2) *St. Clair Intellectual Property Consultants, Inc. v. Canon Inc., et al.*, No. 03-CV-241

2    (JJF), on February 28, 2003 ("the *Canon* Action"); and (3) *St. Clair Intellectual Property*

3    *Consultants, Inc. v. Samsung Electronics, et al.*, No. 04-CV-1436 (JJF) ("the *Samsung* Action"), on

4    November 9, 2004.

5        115.    Upon information and belief, in each of the *Sony, Canon* and *Samsung* actions, St.

6    Clair has knowingly falsely represented itself as the owner of the Roberts Patents to many third

7    parties, including Canon, Inc. and Canon USA, Inc. (collectively, "Canon"); Casio, Inc.; Casio

8    Computer Co., Ltd.; Seiko Epson Corp.; Epson America, Inc.; Fuji Photo Film Co., Ltd., Fuji Photo

9    Film U.S.A., Inc. and FujiFilm America, Inc. (collectively, "Fuji"); Kyocera Corp.; Kyocera Optics,

10   Inc.; Minolta Co., Ltd.; Minolta Corp.; Nikon Corp.; Olympus Optical Co. Ltd.; Olympus America,

11   Inc.; Samsung Electronics Co., Ltd., Samsung Electronics America Inc., and Samsung Telecom

12   America LLP (collectively, "Samsung"); Matsushita Electric Industrial Co., Ltd.; Panasonic AVC

13   Networks Co.; Matsushita Electrical Corp. of America; Victor Company of Japan LTD; JVC

14   Americas Corp.; JVC Company of America; Nokia Corporation; Nokia Mobile Phones; Nokia Inc.;

15   Hewlett-Packard Co.; Sony Corporation, Sony Electronics Inc., Sony Corporation of America and

16   Sony Corporation (collectively, "Sony"); and Eastman Kodak.

17       116.    Upon information and belief, St. Clair has obtained verdicts and judgments for

18   damages from Sony, Canon and Fuji's alleged infringement of the Roberts Patents exceeding a total

19   of $62 million.

20       117.    Upon information and belief, St. Clair has entered into licenses with other defendants

21   in the *Sony, Canon* and *Samsung* actions and other non-party companies over the Roberts Patents for

22   comparable value.

23       118.    Upon information and belief, St. Clair is not entitled to any of damages awards or

24   licensing fees it has received in connection with the Roberts Patents.

25       119.    Upon information and belief, based on the Summer 1995 purchase agreement

26   between St. Clair and PCC, St. Clair has divided its gains from the Roberts Patents equally with

27   PCC.

28

1    120.    Upon information and belief, PCC is not entitled to any of the profits or royalties it

2    has received from St. Clair.

3    **MIRAGE'S DELAYED DISCOVERY OF THE ROBERTS PATENTS**

4    121.    Mirage had no knowledge of the Roberts Patents, the circumstances or involvement

5    by the Inventors with the digital camera invention or patent application, the Inventors' knowing

6    misrepresentations and material omissions, PCC or St. Clair until November 2003, and could not

7    have discovered those facts at an earlier time.

8    122.    Mirage could not have known of the '459 patent application, because the PTO keeps

9    patent applications confidential.

10    123.    Mirage relied on the Inventors and their fiduciary duties of candor, loyalty, full

11    disclosure, good faith and fair dealing to Mirage.

12    124.    The Inventors actively, intentionally and fraudulently concealed the fact of their

13    invention from Mirage.

14    125.    The Inventors failed to disclose to Mirage one or more materials facts, including,

15    without limitation, any one or a combination of the UAV/camera business opportunities presented by

16    Mirage, the digital camera invention, their business plans for a digital camera and A/D image

17    converter, their formation and incorporation of PCC and the '459 patent application. The Inventors

18    failed to disclose these facts even though they were employed by Mirage at the time and subject to

19    fiduciary obligations imposed by the nature of Mirage's business, the scope of their business

20    development duties and their Employment Agreements. These omissions were done knowingly, in

21    bad faith and with the intent to defraud and deprive Mirage of Mirage's rightful title to and

22    ownership of the Roberts Patents.

23    126.    Without actual notice of any of the circumstances surrounding the invention or the

24    invention itself, and relying on the fiduciary duties of its employees and officer, Mirage had no

25    reason to inquire about any inventions or patents involving the inventors.

26    127.    Mirage first learned of the Roberts Patents in November 2003, when Canon served

27    Mirage with a subpoena for documents relating to the *Canon* Action between St. Clair and Canon.

28

128.    Prior to November 2003, Mirage had no knowledge of the Roberts Patents or St. Clair's litigations over those patents.

129.    On April 30, 2004, after several months of negotiations, Mirage and Canon entered into "Consulting Agreement and Covenant Not to Sue" ("Covenant") wherein Canon requested Mirage's assistance with its litigation against St. Clair in exchange for a lump-sum payment of $75,000 and incidental costs and expenses related to time spent by Mirage employees in providing assistance.

130.    After Mirage entered the Covenant with Canon, it discovered that the Inventors had breached their fiduciary duties of candor, loyalty, full disclosure, good faith and fair dealing to Mirage by intentionally concealing the existence of the invention and patent, failing to disclose the invention upon leaving Mirage's employ and intentionally withholding business opportunities from Mirage, among other acts alleged above.

131.    Mirage first learned of the fraud the inventors perpetrated on it after April 30, 2004, as Mirage was conducting its investigation into the Roberts Patents.

132.    Upon information and belief, the Inventors knowingly provided false affirmations upon their exit interviews and omitted information about the Roberts Patents with the intent to defraud Mirage and prevent any inquiry into the invention by actively concealing and misrepresenting such material information.

133.    Prior to entering the Covenant with Canon, Mirage could not have known of Inventors' fraudulent concealment because it had no reason to question the Inventors' prior representations to them.

134.    Considering the Inventors' fiduciary relationship with Mirage, Mirage justifiably relied on the Inventors' prior statements and trusted that they had disclosed pertinent business opportunities and developments to Mirage in the course of their employment.

## COUNT I: BREACH OF CONTRACT
## (AGAINST SPEASL, ROBERTS AND CHIKOSKY)

MIRAGE

135.    ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1 through 134 above.
RC

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and Injunctive Relief – Case No. 1-05-CV-031964        18

1    136.    Each Inventor had an Employment Agreement with Mirage.

2    137.    Mirage satisfied and performed all of its duties under the Employment Agreements.

3    138.    Each Inventor breached his Employment Agreement in several ways, including,

4    without limitation, by:

5        (a)    intentionally concealing the business opportunity of a UAV
        with a digital camera from Mirage;

6        (b)    intentionally concealing the digital camera invention to
        Mirage;

7        (c)    filing a patent application on an invention owned by Mirage
        without notifying Mirage;

8        (d)    intentionally concealing the issuance of the '459 patent from
        Mirage;

9        (e)    intentionally concealing information that would benefit
        Mirage on existing and contemplated projects;

10       (f)    failing to keep in confidence and trust Mirage's Proprietary
        Information from third parties, such as the PTO, PCC, Fish,

11           Chung and St. Clair, among others;

    (g)    using and disclosing Proprietary Information to the PTO, PCC,
12           Fish, Chung and St. Clair, among others, without Mirage's
        written consent;

13       (h)    incorporating and engaging in the activities of PCC while
        employed by Mirage, without Mirage's written consent; and

14       (i)    fraudulently assigning rights to the Roberts Patents to PCC,
        and in turn, to St. Clair.

15

16   139.    Each breach by each Inventor was willful, intentional, deliberate and in bad faith.

17   140.    Because of the Inventors' fraudulent concealment of material information regarding

18   the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

19   on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

20   the Roberts Patents and its rights in them until November 2003, at the earliest.

21   141.    As a result, Mirage's cause of action against Defendants could not accrue until

22   November 2003, at the earliest.

23   142.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

24   143.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

25   proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

26   Court.

27   **COUNT II: DECLARATORY JUDGMENT OF OWNERSHIP AND QUIET TITLE
(AGAINST ALL DEFENDANTS)**

28

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and    19
Injunctive Relief – Case No. 1-05-CV-031964

1    144.    ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1

2    through 143 above.

3    145.    An actual and justiciable controversy over the ownership and title of the Roberts

4    Patents, the subject matter thereof and any patents or applications stemming from them has arisen

5    and currently exists between ~~Eastman Kodak~~ MIRAGE BS and the Defendants.

6    146.    ~~Eastman Kodak~~ MIRAGE BS and the Defendants will suffer hardship if judicial consideration is

7    withheld.

8    147.    The Inventors assigned their rights in the Roberts Patents, the subject matter thereof

9    and any patents or applications stemming from them on the dates they signed their Employment

10    Agreements.

11    148.    St. Clair alleges that it owns the Roberts Patents.

12    149.    Based on the assignments in the Employment Agreements, Mirage, at all times up to

13    June 10, 2005, has been the rightful owner and titleholder of the Roberts Patents.

14    150.    ~~Eastman Kodak~~ ShH BS became the rightful owner and titleholder of the Roberts Patents

15    when it purchased those assets from Mirage on June 10, 2005.

16    151.    Because of the Inventors' fraudulent concealment of material information regarding

17    the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

18    on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

19    the Roberts Patents and its rights in them until November 2003, at the earliest.

20    152.    As a result, Mirage's cause of action against Defendants could not accrue until

21    November 2003, at the earliest.

22    153.    ~~Eastman Kodak~~ MIRAGE BS now timely raises this cause of action against Defendants.

23    154.    ~~Eastman Kodak~~ MIRAGE BS requests a judicial determination of its rights and a declaration that it

24    is the true and proper owner of all legal and equitable right, title and interest in the Roberts Patents

25    and the subject matter thereof.

26    155.    ~~Eastman Kodak~~ MIRAGE BS requests a judicial determination that the Inventors, PCC and St.

27    Clair were not, at any time, owners or titleholders of the Roberts Patents or subject matter thereof.

28    **COUNT III: FRAUD**
**(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

156.    ~~Eastman Kodak~~ MIRAGE & incorporates by reference herein the allegations of Paragraphs 1 through 155 above.

157.    The Inventors knowingly concealed and misrepresented material facts from Mirage regarding the existence and ownership of the digital camera invention and the Roberts Patents.

158.    The Inventors concealed and misrepresented facts with the intent to defraud Mirage and induce Mirage's reliance on their omissions and misrepresentations to Mirage's detriment.

159.    Based on the Inventors' fiduciary duty to Mirage, Mirage reasonably and justifiably relied on the Inventors' knowing, fraudulent omissions and misrepresentations, not knowing that they were false.

160.    Mirage actually relied on the Inventors' fraudulent omissions and misrepresentations in entering the Covenant with Canon.

161.    · But for the inventors' fraudulent concealment and material misrepresentations, Mirage would not have accepted Canon's offer of $75,000 to enter the Covenant, and would not have entered such a Covenant with Canon.

162.    The inventors' fraudulent concealment and material misrepresentations have caused harm to Mirage, including, without limitation, unwanted litigation, damage to Mirage's credibility and reputation, and business opportunity costs.

163.    As a result of Mirage's Covenant with Canon, Mirage has been dragged into a special proceeding in the District of Delaware involving St. Clair and Canon and is also involved in two litigations with St. Clair.

164.    Mirage has incurred extensive legal fees and spent valuable time and resources in defending against and prosecuting these actions, which has created additional harm to its current business in time, expense and opportunity costs, which has now become Eastman Kodak's burden.

165.    ~~Eastman Kodak~~ MIRAGE 'S now timely raises this cause of action against Defendants.

166.    ~~Eastman Kodak~~ MIRAGE 'S suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

## COUNT IV: BREACH OF FIDUCIARY DUTY
## (AGAINST SPEASL, ROBERTS & CHIKOSKY)

167. ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1 through 166 above. ßS

168. Each Inventor had a fiduciary duty of candor, loyalty, full disclosure, good faith and fair dealing to Mirage.

169. The Inventors, jointly and severally, breached their fiduciary duties to Mirage in several ways, including, without limitation, by:

    (a)    misappropriating Mirage's UAV and digital camera business opportunity for themselves;

    (b)    intentionally concealing the business opportunity of a UAV with a digital camera from Mirage;

    (c)    intentionally concealing the digital camera invention to Mirage;

    (d)    filing a patent application on an invention owned by Mirage without notifying Mirage;

    (e)    intentionally concealing the issuance of the '459 patent from Mirage;

    (f)    intentionally concealing information that would benefit Mirage on existing and contemplated projects;

    (g)    failing to keep in confidence and trust Mirage's Proprietary Information;

    (h)    using and disclosing Proprietary Information to the PTO, PCC, Fish, Chung and St. Clair, among others, without Mirage's written consent;

    (i)    incorporating and engaging in the activities of PCC while employed by Mirage, without Mirage's written consent; and

    (j)    fraudulently assigning rights to the Roberts Patents to PCC, and in turn, to St. Clair.

170. Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

171. As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

172. ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants. ßS

173. ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and ßS proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

## COUNT V: CONVERSION
### (AGAINST SPEASL, ROBERTS AND CHIKOSKY)

174.    ~~Eastman Kodak~~ MIRAGE ¾ incorporates by reference herein the allegations of Paragraphs 1 through 173 above.

175.    Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents and the subject matter thereof.

176.    Eastman Kodak became the rightful owner of all right, title and interest in the Roberts Patents and subject matter thereof on June 10, 2005.

177.    The Defendants, individually and in conspiracy with one another, intentionally took possession of the Roberts Patents and the subject matter thereof in the Fall of 1989, intentionally depriving Mirage of its Proprietary Information involving the digital camera invention.

178.    The Defendants, individually and in conspiracy with one another, intentionally took possession of the Roberts Patents and the subject matter thereof on November 20, 1990, when they filed their patent application, intentionally depriving Mirage of its right to control its Proprietary Information and trade secrets involving the digital camera invention.

179.    The Defendants, individually and in conspiracy with one another, intentionally transferred the Roberts Patents and the subject matter thereof on or about January 8, 1992, to PCC, intentionally depriving Mirage of its right and title to the Roberts Patents and the subject matter thereof.

180.    Because of the Inventors' fraudulent concealment of material information regarding the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

181.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

182.    ~~Eastman Kodak~~ MIRAGE B3 now timely raises this cause of action against Defendants.

1    183.   ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

2  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

3  Court.

4                          **COUNT VI: CONVERSION**
                     **(AGAINST DEFENDANT ST. CLAIR)**
5

6    184.   ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

7  through 183 above.

8    185.   Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents

9  and the subject matter thereof.

10   186.   Eastman Kodak became the rightful owner of all right, title and interest in the Roberts

11  Patents and subject matter thereof on June 10, 2005.

12   187.   St. Clair, individually and in conspiracy with the other Defendants, intentionally took

13  possession of the Roberts Patents and the subject matter thereof in the Summer of 1995, intentionally

14  depriving Mirage of its right and title to the Roberts Patents and the subject matter thereof.

15   188.   St. Clair, individually and in conspiracy with the other Defendants, intentionally

16  asserted itself as the owner the Roberts Patents in the *Sony, Canon* and *Samsung* Actions,

17  intentionally depriving Mirage of its right and title to the Roberts Patents and the subject matter

18  thereof.

19   189.   St. Clair, individually and in conspiracy with the other Defendants, intentionally

20  asserted itself as the owner the Roberts Patents in negotiations with third parties from 2001 to the

21  present, intentionally depriving Mirage of its right and title to the Roberts Patents and the subject

22  matter thereof.

23   190.   Because of the Inventors' fraudulent concealment of material information regarding

24  the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

25  on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

26  the Roberts Patents and its rights in them until November 2003, at the earliest.

27   191.   As a result, Mirage's cause of action against Defendants could not accrue until

28  November 2003, at the earliest.

192. ~~Eastman Kodak~~ *Mirage* now timely raises this cause of action against Defendants.

193. ~~Eastman Kodak~~ *Mirage* suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

### COUNT VII: MISAPPROPRIATION OF TRADE SECRETS (AGAINST SPEASL, ROBERTS AND CHIKOSKY)

194. ~~Eastman Kodak~~ *Mirage* incorporates by reference herein the allegations of Paragraphs 1 through 193 above.

195. Mirage, at all times prior to June 10, 2005, owned and held title to the Roberts Patents and the subject matter thereof.

196. Eastman Kodak became to rightful owner of all right, title and interest in the Roberts Patents and subject matter thereof on June 10, 2005.

197. The Inventors' Employment Agreements expressly recognized the confidential, proprietary and trade secret nature of any inventions discovered or developed in the course each Inventor's employment with Mirage.

198. In 1989 and 1990, most, if not all, of Mirage's work was classified or top secret in nature, could not be disclosed, and had to be kept as trade secret.

199. Mirage took reasonable and extensive steps to protect its trade secrets and other Proprietary Information by requiring the Inventors to sign Employment Agreements with multiple clauses involving confidentiality of information and protection of Proprietary Information.

200. The Inventors' duties to keep information confidential extended beyond their employment with Mirage.

201. Defendants misappropriated Mirage trade secrets by willfully, intentionally and in bad faith depriving Mirage of its trade secret rights, including, but not limited to, taking the business opportunity presented by Mirage's potential customer for themselves in the Fall of 1989 and by filing a patent application on the digital camera invention, which was a protected trade secret, on November 20, 1999.

1      202.    Upon information and belief, at the time the Defendants misappropriated Mirage's

2  trade secrets, they knew or should have known that they acquired those trade secrets under

3  circumstances giving rise to a duty to maintain their secrecy or limit their use. Upon information

4  and belief, at the same time, the Inventors knew they owed Mirage a duty to keep those trade secrets

5  confidential and limit their use.

6      203.    By filing a patent application on the digital camera invention, the Inventors destroyed

7  Mirage's ability to decide the best course of action to exploit its trade secrets and other Proprietary

8  Information.

9      204.    Because of the Inventors' fraudulent concealment of material information regarding

10 the digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance

11 on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about

12 the Roberts Patents and its rights in them until November 2003, at the earliest.

13     205.    As a result, Mirage's cause of action against Defendants could not accrue until

14 November 2003, at the earliest.

15     206.    ~~Eastman Kodak~~ MIRAGE BS now timely raises this cause of action against Defendants.

16     207.    ~~Eastman Kodak~~ MIRAGE BS suffered and continues to suffer actual damages as a direct and

17 proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

18 Court.

19

20               **COUNT VIII: INTENTIONAL INTERFERENCE**
           **WITH PROSPECTIVE ECONOMIC ADVANTAGE**

21             **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

22     208.    ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1

23 through 207 above.

24     209.    An economic relationship existed between Mirage and the Mirage customer that met

25 with Chikosky to discuss a UAV with a camera that had probable future economic benefit to both

26 Mirage and its customer.

27     210.    The Inventors, as fiduciaries, employees and business development personnel of

28 Mirage, knew of the probable relationship between Mirage and its customer.

1    211.    The Inventors intentionally disrupted the relationship between Mirage and its

2    customer by, among other acts, usurping the opportunity offered by Mirage's customer for

3    themselves, failing to inform Mirage of such opportunity, filing a patent application without

4    informing Mirage, purporting to assign the '459 patent to PCC, approaching Chung and St. Clair for

5    business opportunities and purporting to sell, through PCC, the Roberts Patents to St. Clair.

6    212.    Mirage did not achieve a relationship with its customer because of the Inventors'

7    deliberate actions.

8    213.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

9    214.    Because of the Inventors' fraudulent concealment of material information regarding

10    the customer communications, digital camera invention, and the Roberts Patents, and Mirage's

11    justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

12    and could not have known about the Roberts Patents and its rights in them until November 2003, at

13    the earliest.

14    215.    As a result, Mirage's cause of action against Defendants could not accrue until

15    November 2003, at the earliest.

16    216.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

17    217.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

18    proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

19    Court.

20

21                **COUNT IX: NEGLIGENT INTERFERENCE**
                **WITH PROSPECTIVE ECONOMIC ADVANTAGE**
22                **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

23    218.    ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

24    through 217.

25    219.    An economic relationship existed between Mirage and the Mirage customer that met

26    with Chikosky to discuss a UAV with a camera that had probable future economic benefit to both

27    Mirage and its customer.

28    220.    The Inventors, as fiduciaries, employees and business development personnel Mirage

1   knew of the probable relationship between Mirage and its customer.

2       221.   The Inventors negligently disrupted the relationship between Mirage and its customer

3   by, among other acts, usurping the opportunity offered by Mirage's customer for themselves, failing

4   to inform Mirage of such opportunity, filing a patent application without informing Mirage,

5   purporting to assign the '459 patent to PCC, approaching Chung and St. Clair for business

6   opportunities and purporting to sell, through PCC, the Roberts Patents to St. Clair.

7       222.   Mirage did not achieve a relationship with its customer because of the Inventors'

8   negligent actions.

9       223.   The Defendants' conduct was a substantial factor in causing harm to Mirage.

10       224.   Because of the Inventors' fraudulent concealment of material information regarding

11   the customer communications, digital camera invention and the Roberts Patents, and Mirage's

12   justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

13   and could not have known about the Roberts Patents and its rights in them until November 2003, at

14   the earliest.

15       225.   As a result, Mirage's cause of action against Defendants could not accrue until

16   November 2003, at the earliest.

17       226.   ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

18       227.   ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

19   proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

20   Court.

21               **COUNT X: INTENTIONAL MISREPRESENTATION**

22              **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

23       228.   ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

24   through 227 above.

25       229.   Each Inventor entered into an Employment Agreement with Mirage when he became

26   a Mirage employee.

27       230.   Each Employment Agreement contained express representations made by the

28   employee to Mirage, relating to inventions.

1    231.    Roberts disclosed three inventions in his Employment Agreement which are not

2  related to the subject matter of the Roberts Patents. Speasl and Chikosky disclosed in their

3  Employment Agreements that they had no inventions. Thus, each Defendant affirmatively

4  represented to Mirage that he had or knew of no inventions relating to the subject matter of the

5  Roberts Patents.

6    232.    Each Employment Agreement afforded the employee an opportunity to disclose any

7  rights that he wished to exclude from the terms of the Agreement which vest all rights in inventions

8  and proprietary information in Mirage. By failing to promptly disclose the subject matter of the

9  Roberts Patents to Mirage, each Defendant, acting individually and in conspiracy with one another,

10  represented to Mirage that the subject matter of the Roberts Patents did not exist.

11    233.    Each Defendant had actual knowledge of the falsity of this ongoing misrepresentation

12  to Mirage. Their actual knowledge of the inventions is proved by the filing of the applications for

13  the Roberts Patents. Each such false representation by each Defendant was willful, intentional,

14  deliberate, and in bad faith. Even if any Defendant lacked actual knowledge of the falsity of his

15  ongoing misrepresentation, he acted recklessly with respect to the truth relating to his ongoing

16  misrepresentation.

17    234.    Each Inventor intended to defraud Mirage and to induce Mirage's reliance on their

18  individual and joint misrepresentations by actively concealing the existence of the subject matter of

19  the Roberts Patents from Mirage.

20    235.    Mirage reasonably and justifiably relied on the Defendants' individual and joint

21  misrepresentations because each Inventor was under an ongoing obligation to disclose such

22  information to Mirage under the terms of his Employment Agreement. Mirage has the right to

23  expect the undivided loyalty of its employees and to expect that others will obey the law.

24    236.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

25    237.    Because of the Inventors' fraudulent concealment of material information regarding

26  the customer communications, digital camera invention and the Roberts Patents, and Mirage's

27  justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

28  and could not have known about the Roberts Patents and its rights in them until November 2003, at

1  the earliest.

2       238.   As a result, Mirage's cause of action against Defendants could not accrue until

3  November 2003, at the earliest.

4       239.   ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

5       240.   ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

6  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

7  Court.

8  ///

9  ///

10  ///

11         **COUNT XI: NEGLIGENT MISREPRESENTATION**
              **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**
12

13       241.   ~~Eastman Kodak~~ MIRAGE incorporates by reference herein the allegations of Paragraphs 1

14  through 240 above.

15       242.   Each Inventor entered into Employment Agreement with Mirage when he became a

16  Mirage employee.

17       243.   Each Defendant's Employment Agreement contained express representations made

18  by the employee to Mirage, relating to inventions.

19       244.   Roberts disclosed three inventions in his Employment Agreement which are not

20  related to the subject matter of the Roberts Patents.  Speasl and Chikosky disclosed in their

21  Employment Agreements that they had no inventions.  Thus, each Defendant affirmatively

22  represented to Mirage that he had or knew of no inventions relating to the subject matter of the

23  Roberts Patents.

24       245.   Each Employment Agreement invited the employee to disclose any rights that he

25  wished to exclude from the terms of the Agreement which vest all rights in inventions and

26  proprietary information in Mirage.  By failing to promptly disclose the subject matter of the Roberts

27  Patents to Mirage, each Defendant, acting individually and in conspiracy with one another,

28  represented to Mirage that the subject matter of the Roberts Patents did not exist.

1  246.  None of the Inventors had any reasonable grounds for believing his ongoing

2  representations to Mirage were tree because they devoted a substantial amount of time to developing

3  and reducing to practice the subject matter of the Roberts Patents and went to the substantial expense

4  of filing the applications for the Roberts Patents.  The Defendants could not have devoted such time

5  and expense to such a project and not known of the project's existence.

6  247.  Each Inventor made negligent misrepresentations to Mirage and induced Mirage's

7  reliance on their individual and joint misrepresentations as to the existence of the Roberts Patents

8  and the subject matter thereof.  Each such act by each Defendant was in negligent breach of their

9  obligations, deliberate, and in bad faith.

10  248.  Mirage reasonably and justifiably relied on the Defendants' individual and joint

11  misrepresentations because each Inventor was under an ongoing obligation to disclose such

12  information to Mirage under the terms of his Employment Agreement.  Mirage has the right to

13  expect the undivided loyalty of its employees and to expect that others will obey the law.

14  249.  The Defendants' conduct was a substantial factor in causing harm to Mirage.

15  250.  Because of the Inventors' fraudulent concealment of material information regarding

16  the customer communications, digital camera invention and the Roberts Patents, and Mirage's

17  justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

18  and could not have known about the Roberts Patents and its rights in them until November 2003, at

19  the earliest.

20  251.  As a result, Mirage's cause of action against Defendants could not accrue until

21  November 2003, at the earliest.

22  252.  ~~Eastman Kodak~~ MIRAGE BS now timely raises this cause of action against Defendants.

23  253.  ~~Eastman Kodak~~ MIRAGE BS suffered and continues to suffer actual damages as a direct and

24  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

25  Court.

26  **COUNT XII: FRAUDULENT CONCEALMENT**
   **(AGAINST SPEASL, ROBERTS AND CHIKOSKY)**

27

28  254.  ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1

Amended and Supplemental Complaint for Declaratory Relief, Damages, Restitution, Disgorgement of Profits and     31
Injunctive Relief – Case No. 1-05-CV-031964

1  through 253 above.

2       255.    Each Inventor was an employee of Mirage during the first portion of his active,

3  ongoing concealment of material information from Mirage and owed a duty of disclosure to Mirage.

4       256.    Each Defendant, acting individually and in conspiracy with one another, intentionally

5  failed to disclose the subject matter of the Roberts Patents to Mirage, and the Inventors actively

6  concealed such information from Mirage.  Each such act by each Defendant was willful, intentional,

7  deliberate, and in bad faith.

8       257.    Each Defendant, both individually and in conspiracy with one another, intended to

9  deceive Mirage by concealing the subject mattes of the Roberts Patents.

10      258.    Mirage reasonably and justifiably relied on the Defendants' individual and joint

11  deceptions because each Inventor was under an ongoing obligation to disclose such information to

12  Mirage under the terms of his Employment Agreement.  Mirage has the right to expect the undivided

13  loyalty of its employees and to expect that others will obey the law.

14      259.    Based on the Defendants' knowing, intentional omission of material facts, Mirage

15  determined that its C3I Division had not developed sustainable business opportunities, and closed

16  the C3I Division.

17      260.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

18      261.    Because of the Inventors' fraudulent concealment of material information regarding

19  the customer communications, digital camera invention and the Roberts Patents, and Mirage's

20  justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

21  and could not have known about the Roberts Patents and its rights in them until November 2003, at

22  the earliest.

23      262.    As a result, Mirage's cause of action against Defendants could not accrue until

24  November 2003, at the earliest.

25      263.    ~~Eastman Kodak~~ MIRAGE now timely raises this cause of action against Defendants.

26      264.    ~~Eastman Kodak~~ MIRAGE suffered and continues to suffer actual damages as a direct and

27  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

28  Court.

### COUNT XIII: UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

265.    ~~Eastman Kodak~~ MIRAGE BS incorporates by reference herein the allegations of Paragraphs 1 through 264 above.

266.    Each Defendant, acting individually and in conspiracy with one another, has engaged in unfair competition under Cal. Bus. & Prof. Code § 17200, *et seq*. Each Defendant has engaged in unlawful, unfair, and fraudulent business practices.

267.    Each Defendant, acting individually and in conspiracy with one another, has acted unlawfully by such acts as violating the Uniform Trade Secrets Act, committing the tort of conversion, tortiously breaching duties to Mirage, intentionally and negligently interfering with Mirage's prospective economic advantage, intentionally and negligently misrepresenting facts to Mirage, concealing important and material information from Mirage, and wrongfully procuring unjust enrichment at Mirage's expense. Each such act by each Defendant was willful, intentional, deliberate, and in bad faith.

268.    Members of the public are likely to be deceived by Defendants' representations.

269.    The Defendants' conduct was a substantial factor in causing harm to Mirage.

270.    Because of the Inventors' fraudulent concealment of material information regarding the customer communications, digital camera invention and the Roberts Patents, and Mirage's justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know and could not have known about the Roberts Patents and its rights in them until November 2003, at the earliest.

271.    As a result, Mirage's cause of action against Defendants could not accrue until November 2003, at the earliest.

272.    ~~Eastman Kodak~~ MIRAGE BS now timely raises this cause of action against Defendants.

273.    ~~Eastman Kodak~~ MIRAGE BS suffered and continues to suffer actual damages as a direct and proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this Court.

### COUNT XIV: UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

MIRAGE ~₧

1    274.   ~~Eastman Kodak~~ incorporates by reference herein the allegations of Paragraphs 1

2  through 273 above.

3    275.   Each Defendant, acting individually and in conspiracy with one another, received

4  benefits from its wrongful conduct and the wrongful conduct of the other Defendants. By way of

5  illustration, but not limitation, each Defendant received benefits from the filing of patent

6  applications, the issuance of patents, the formation and incorporation of PCC, the purported

7  assignment of rights to PCC, the purported assignment of rights to St. Clair, and the enforcement of

8  the Roberts Patents in the St. Clair Infringement Actions. Each Defendant has also received other

9  benefits unknown to Mirage at this time. Each such act by each Defendant was willful, intentional,

10  deliberate, and in bad faith.

11    276.   Each Defendant, acting individually and in conspiracy with one another, wrongfully

12  and unjustly received and retained these benefits at the expense of Mirage.

13    277.   The Defendants' conduct was a substantial factor in causing harm to Mirage.

14    278.   Because of the Inventors' fraudulent concealment of material information regarding

15  the customer communications, digital camera invention and the Roberts Patents, and Mirage's

16  justified and reasonable reliance on the statements of the fiduciary-Inventors, Mirage did not know

17  and could not have known about the Roberts Patents and its rights in them until November 2003, at

18  the earliest.

19    279.   As a result, Mirage's cause of action against Defendants could not accrue until

20  November 2003, at the earliest.

MIRAGE ₧

21    280.   ~~Eastman Kodak~~ now timely raises this cause of action against Defendants.

MIRAGE ₧

22    281.   ~~Eastman Kodak~~ suffered and continues to suffer actual damages as a direct and

23  proximate result of Defendants' actions in an amount in excess of the jurisdictional minimum of this

24  Court.

25    **PRAYER FOR RELIEF**

MIRAGE

26    WHEREFORE, ~~Eastman Kodak~~ prays for judgment against each Defendant and for the relief

₧

27  set forth below:

28    A.   For damages according to proof at the time of trial;

1      B.    For a declaration that Mirage, at all times prior and up to June 10, 2005, has been the

2 legal and equitable owner of all right, title, and interest in the Roberts Patents and the subject matter

3 thereof;

4      C.    For a declaration that Eastman Kodak has been the legal and equitable owner of all

5 right, title, and interest in the Roberts Patents and the subject matter thereof since June 10, 2005;

6      D.    For a declaration that no Defendant was, at any time, an owner or titleholder of the

7 Roberts Patents or subject matter thereof;

8      E.    For an injunction such that each Defendant shall cease representing to others and

9 shall not represent to others any ownership or title in the Roberts Patents or subject matter thereof;

10      F.    For restitution according to proof at the time of trial;

11      G.    For disgorgement of profits according to proof at the time of trial;

12      H.    For exemplary and punitive damages;

13      I.    For reasonable attorneys' fees according to proof;

14      J.    For costs of suit herein incurred; and

15      K.    For such other and further relief as the Court may deem just and proper.

16

17 Dated: June 15, 2005

18

19                        By: _____

20                        Daniel S. Mount, Esq. (State Bar No. 77517)
                             Justin T. Beck, Esq. (State Bar No. 53138)

21                        Ron C. Finley, Esq. (State Bar No. 200549)
                             Mount & Stoelker, P.C.

22                        333 West San Carlos
                             RiverPark Tower, 17th Floor

23                        San Jose CA  95110-2726
                             Phone: (408) 279-7000

24                        Fax:    (408) 998-1473

25                        Attorneys for Plaintiff
                        ~~EASTMAN KODAK COMPANY~~ & 

26                        MIRAGE SYSTEMS, INC.

27

28

# EXHIBIT K

LEXSEE

**UNITED STATES AIRCRAFT INSURANCE GROUP, Plaintiff, v. DWIGGINS, L.L.C. and BOMBARDIER CAPITAL, INC., Defendants.**

**Civ. No. 03-173-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 5607*

**March 31, 2004, Decided**

**PRIOR HISTORY:** *United States Aircraft Ins. Group v. Dwiggins, L.L.C., 2004 U.S. Dist. LEXIS 266 (D. Del., Jan. 5, 2004)*

**DISPOSITION:** [*1] Dwiggins' renewed motion to dismiss was granted. Plaintiff's motion for reconsideration was denied as moot. Plaintiff's motion to compel BCI was denied as moot. Dwiggins' motion for a stay of deadline in which to file an answer was denied as moot. Plaintiff's motion for the issuance of a request for international judicial assistance pursuant to *Fed. R. Civ. P. 28(b)* and the Hague Convention was denied as moot.

**LexisNexis(R) Headnotes**

**COUNSEL:** For UNITED STATES AIRCRAFT INSURANCE GROUP, plaintiff: Sean J. Bellew, Cozen & O'Connor, Wilmington, DE.

For DWIGGINS, LLC, defendant: James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE.

For UNITED STATES AIRCRAFT INSURANCE GROUP, counter-defendant: Sean J. Bellew, Cozen & O'Connor, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Court.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM ORDER**

**I. INTRODUCTION**

This declaratory judgment action was filed by United States Aircraft Insurance Group ("USAIG") on February 5, 2003, against defendants Dwiggins, LLC ("Dwiggins") and Bombardier Capital, Inc. ("BCI"), seeking declaratory relief that an insurance policy issued to Dwiggins is void [*2] ab initio and unenforceable due to material misrepresentations made during the underwriting process and due to Dwiggins' failure to comply with policy conditions. (D.I. 1) Presently before the court is Dwiggins' renewed motion to dismiss. (D.I. 102) Because the court concludes that abstention is warranted, Dwiggins' motion will be granted.

**II. BACKGROUND**

**A. Facts as Alleged by USAIG**

The facts in the present case have been previously summarized in the court's October 15, 2003 memorandum opinion granting partial summary judgment to BCI and in its January 5, 2004 memorandum order denying Dwiggins' motion to dismiss. (D.I. 59, 80) The present dispute relates to a policy for general liability and hull risk insurance for a Lear 60 jet obtained by Dwiggins through USAIG for a policy period beginning on September 10, 2002, and ending on September 10, 2003. The aircraft was financed through an agreement with BCI, which is insured as a lender/lessor under the insurance policy. The insurance policy was procured with the assistance of Palmer & Cay and the Heath Lambert Group.

On October 7, 2002, the aircraft, on its inaugural flight, crashed while landing at the Santa Cruz Airport, [*3] State of Rio do Sul, SSSC, Brazil. On board the aircraft were Luiz A.D. Ferreira, Jose Maria Gelsi, Robert Luiz Catao Martinesz, Julio Sergio Soares

Case 1:05-cv-00273-JJF    Document 30    Filed 07/13/2005    Page 46 of 54

Page 2
2004 U.S. Dist. LEXIS 5607, *

Barbosa, and Telmos Goes. Barbosa was killed in the incident, and the other passengers sustained serious injuries.

### B. USAIG Claims and Procedural History

USAIG filed the present action on February 5, 2003, and asserted the following claims for relief: (1) rescission of the policy as to both defendants alleging that Dwiggins and Bombardier made material misrepresentations during the underwriting process; (2) an order of invalidity as to each defendant on the basis of negligent misrepresentation during the underwriting process; and (3) declaratory judgment against defendant Dwiggins alleging that Dwiggins failed to comply with a condition precedent to coverage. (D.I. 1) BCI counterclaimed for enforcement of its rights under the lender/lessor endorsement. (D.I. 5)

On October 15, 2003, this court granted partial summary judgment to defendant BCI as to count one, except to the extent that Palmer & Cay may have been acting as an agent of BCI, and granted summary judgment to BCI with respect to count two. (D.I. 59, 60) On March 4, 2004, a [*4] joint stipulation of dismissal was entered into between BCI and USAIG. As a consequence, USAIG and Dwiggins are the only parties remaining in the action before the court.

On August 15, 2003, Dwiggins, in its first response to USAIG's complaint, filed the present motion to dismiss or, in the alternative, to stay the proceedings. (D.I. 42) The court denied Dwiggins' motion without prejudice to renew, concluding that the absence of BCI from the related state litigation cautioned against abstention. (D.I. 80) The court indicated, however, that "in the event that USAIG's remaining claim against BCI is resolved before trial, then retaining jurisdiction over the case may no longer be warranted." (D.I. 80 at 12)

### C. Florida Litigation

Shortly after the filing of this case, Dwiggins and American Virginia Tabacaos, Industrisa e Comercio, Importacaco e Exportacao de Tabacos Ltda ("American Virginia"), filed a complaint for declaratory relief and damages in the Circuit Court in and for Broward County, Florida. n1 Named as defendants in that case were United States Aviation Underwriters, Inc. ("USAU"), individually and as manager of USAIG, Palmer & Cay of Florida, LLC ("Palmer & Cay"), [*5] and BCI. n2 Service was effected on USAIG on May 5, 2003. (D.I. 52, ex. B) Dwiggins's Florida complaint seeks the following: (1) declaratory relief against USAU as to the insurance policy's enforceability; (2) damages for breach of contract against USAU; (3) damages for negligence in the procurement of insurance against Palmer & Cay; (4) damages for negligent misrepresentation against BCI on

the grounds that Dwiggins hired Telmos Goes as the pilot based on BCI's recommendations; (5) damages for negligence against BCI with respect to Goes.

n1 Dwiggins is a subsidiary of American Virginia formed for the purpose of purchasing the aircraft at issue.

n2 BCI was subsequently dismissed from the Florida action on Dwiggins' motion for lack of joinder.

On March 17, 2003, the passengers on board the aircraft when it crashed ("the Florida Claimants") filed personal injury actions in the Circuit Court of Dade County, Florida against Dwiggins and American Virginia. The Florida Claimants each have a relationship with American [*6] Virginia. Luiz A.D. Ferreira is the President and Principal of American Virginia. Jose Maria Gelsi is corporate counsel to American Virginia. Roberto Catao Martinez was an employee of American Virginia. Julio Sergio Soares Borbosa was also an employee of American Virginia.

Two weeks after the filing of suits by the Florida Claimants, settlement agreements and assignments were entered into, in which Dwiggins assigned any rights against USAIG to the Florida Claimants, and final judgments were entered in the Dade County actions in favor of the Florida Claimants and against Dwiggins totaling $ 30 million. Following their settlements with Dwiggins, the Florida Claimants filed four suits against USAIG and Palmer Cay in Broward County, Florida, on May 14, 2003. The suits allege breach of contract claims against USAIG and negligence claims against Palmer & Cay.

### III. DISCUSSION

It is well established that district courts should exercise discretion in determining whether to entertain an action brought pursuant to the *Declaratory Judgment Act.* See *State Auto Ins. Cos. v. Summy, 234 F.3d 131, 133 (3d Cir. 2001).* Careful scrutiny should be given to such actions where [*7] there is pending state court litigation between the same parties concerning the same issues. See *Brillhart v. Excess Ins. Co. Of America, 316 U.S. 491, 495, 86 L. Ed. 1620, 62 S. Ct. 1173 (1942).*

The Third Circuit has set forth general guidelines that a district court should consider in exercising its discretion under the Act including: (1) whether the issues in controversy between the parties are foreclosed under the applicable substantive federal law and whether these issues may be settled better in the proceeding pending in the state court; (2) the likelihood that the declaration will

resolve the uncertainty of obligation which gave rise to the controversy; (3) the convenience of the parties; (4) the public interest in a settlement of the uncertainty of obligation; and (5) the availability and relative convenience of other remedies. See *Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1225 (3d Cir. 1989)* (citations omitted).

As the court indicated in its January 5, 2004 memorandum order, the litigation in Florida state court raises all of the issues present before this court. (D.I. 80) The central issue is the same, namely, the validity and scope of insurance [*8] coverage. The issues of validity which USAIG seeks to adjudicate here are available defenses in Florida court. n3 Moreover, a resolution of the issues in the present action would not necessarily resolve all of the defenses and claims available in the Florida cases, such as the USAIG's contention that the Florida settlement agreements were collusively reached. The court denied Dwiggins' original motion to dismiss without prejudice largely because BCI was not joined in the Florida litigation and dismissal as to Dwiggins might create the kind of piecemeal litigation that abstention is intended to avoid. As BCI has been voluntarily dismissed, all the parties present before the court are also joined in the Florida litigation. (D.I. 108) Moreover, there are additional parties in the Florida litigation that are not present here, particularly Palmer & Cay and the Florida Claimants. n4

> n3 USAIG asserts that any claims BCI might have against Dwiggins have been assigned to USAIG and are not before the Florida court. (D.I. 106 at 9) Prior to its dismissal, however, BCI had not asserted any cross-claims against Dwiggins and there is nothing to suggest that any potential counter-claims USAIG might have as BCI's assignee are unavailable in the Florida courts. [*9]

> n4 The court's January 5, 2004 decision that the Florida Claimants were not parties necessary for adjudication does not render their absence from the case irrelevant for purposes of determining whether retaining the case is consistent with principles of judicial economy.

Considering the first and second *Terra Nova* factors, the court does not find that it is better able to determine USAIG's obligations of the interested parties under the policy than the state courts of Florida. In particular, as

there are additional parties in the Florida litigation that have an interest in the resolution of this dispute, these factors weigh in favor of abstention. Under the third and fifth Terra Nova factors, the court finds that these too support abstention. There is nothing in the record to suggest either that the district court of Delaware is more convenient or has remedies not available to the parties in the Florida litigation. Finally, considering the fourth Terra Nova factor, there is not a compelling public interest in resolution of a rather ordinary insurance coverage dispute. See *Summy, 224 F.3d at 135* [*10] ("The desire of insurance companies and their insureds to receive declarations in federal court on matters of purely state law has no special call on the federal forum.").

Contrary to USAIG's assertions, the court finds that continuing the present action while identical litigation exists in Florida state court would be unnecessarily duplicative and vexatious. As the Supreme Court articulated in Wilton v. Seven Falls Co., "in the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *515 U.S. 277, 288, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995)*. In the present case, the court concludes that, because all of the issues and parties are present in the Florida litigation and because the Florida litigation has additional interested parties and issues relevant to the practical and timely disposition of claims, abstention is warranted.

Consequently, this 31st day of March, 2004, having concluded that principles of judicial economy support abstention in the present case;

IT IS ORDERED that:

1. Dwiggins' renewed motion to dismiss (D.I. 102) is **granted.** [*11]

2. USAIG's motion for reconsideration (D.I. 63) is **denied** as moot.

3. USAIG's motion to compel BCI (D.I. 86) is **denied** as moot.

4. Dwiggins' motion for a stay of deadline in which to file an answer (D.I. 95) is **denied** as moot.

5. USAIG's motion for the issuance of a request for international judicial assistance pursuant to *Fed. R. Civ. P. 28(b)* and the Hague Convention (D.I. 112) is **denied** as moot.

Sue L. Robinson

United States District Court

# EXHIBIT L



1
2
3
4
5
6
7
8                    **SUPERIOR COURT OF CALIFORNIA**

9                        **COUNTY OF SANTA CLARA**

10
11

12   MIRAGE SYSTEMS, INC.,                Case No.        CV 1-05-CV 039164

13                        Plaintiff,

14   vs.                                  ORDER RE: MOTION TO QUASH
                                          SERVICE OF SUMMONS
15

16   JERRY SPEASL, et al.,

17                        Defendants.

18

19        The Motion to Quash Service of Summons by defendant Matthew Chikosky came on for

20   hearing before the Honorable Jamie Jacobs-May on June 28, 2005, at 9:00 a.m. in Department 4.

21   The matter having been submitted, the Court finds and orders as follows:

22

23        The motion to quash is denied.

24

25

26   Dated:   6/28/05

27                                          _____
                                            Jamie Jacobs-May
28                                          Judge of the Superior Court

1

ORDER RE: MOTION TO QUASH



IN THE SUPERIOR COURT OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| Plaintiff:   MIRAGE SYSTEMS, INC | |
| Defendant: JERRY SPEASL, et al. | |
| **PROOF OF SERVICE BY MAIL OF:  ORDER RE: MOTION TO QUASH SERVICE OF SUMMONS** | Case No: 1-05-CV-039164 |

(ENDORSED)
F I L E D
JUN 2 8 2005
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

CLERK'S CERTIFICATE OF SERVICE:   I certify that I am not a party to this case and that a true copy of this document was mailed first class, postage fully prepaid, in a sealed envelope addressed as shown below and the document was mailed at SAN JOSE, CALIFORNIA on June 28, 2005.

Kiri Torre, Chief Executive Officer/Clerk

BY _____, Deputy
C. Collins

Gregory Storey, Esq.
80 North First Street
San Jose, CA 95113

Ron C. Finley, Esq.
333 West San Carlos
RiverPark Tower, 17th Floor
San Jose, CA 95110-2726

Joshua Baker, Esq.
1625 Eye Street, NW
Washington, DC 20006

# EXHIBIT M

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Ron C. Finley (SBN200549)<br>Mount & Stoelker, P.C.<br>333 W. San Carlos Street 17th Floor<br>TELEPHONE NO.: 408-279-7000      FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff: Mirage Systems Inc | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS: Same
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Superior Civil

| PLAINTIFF/PETITIONER: Mirage Systems, INC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Jerry Speasl, Mark K. Roberts, et al | 1-05-CV-039164 |
| | Ref. No. or File No.: |

| PROOF OF SERVICE OF SUMMONS | |
|---|---|

*(Separate proof of service is required for each party served.)*

1.   At the time of service I was at least 18 years of age and not a party to this action.
2.   I served copies of:
     a.   ☑   summons
     b.   ☑   complaint
     c.   ☐   Alternative Dispute Resolution (ADR) package
     d.   ☑   Civil Case Cover Sheet *(served in complex cases only)*
     e.   ☐   cross-complaint
     f.   ☐   other *(specify documents):* 1)Amended and supplemental complaint for declaratory relief, damages, restitution, disgorgement of
              profits and injunctive relief
3.   a.   Party served *(specify name of party as shown on documents served):*
          Mark K. Roberts

     b.   Person served:   ☑   party in item 3a   ☐   other *(specify name and relationship to the party named in item 3a):*

4.   Address where the party was served: 16981 HOSKINS STREET  HUNTINGTON BEACH, CA 92649

5.   I served the party *(check proper box)*
     a.   ☑   **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to
              receive service of process for the party (1) on *(date):* 6/26/05      (2) at *(time):* 11:40 AM
     b.   ☐   **by substituted service.** On *(date):*      at *(time):*      I left the documents listed in item 2 with or
              in the presence of *(name and title or relationship to person indicated in item 3b):*

          (1)   ☐   **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business
                    of the person to be served. I informed him or her of the general nature of the papers.
          (2)   ☐   **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual
                    place of abode of the party. I informed him or her of the general nature of the papers.
          (3)   ☐   **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing
                    address of the person to be served, other than a United States Postal Service post office box.  I informed
                    him or her of the general nature of the papers.
          (4)   ☐   I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served
                    at the place where the copies were left (Code Civ. Proc., § 415.20).  I mailed the documents on
                    *(date):*      from *(city):*      or ☐ a declaration of mailing is attached.
          (5)   ☐   I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. July 1, 2004] | PROOF OF SERVICE OF SUMMONS | Code of Civil Procedure, § 417.10<br>American LegalNet, Inc.<br>www.USCourtForms.com |
|---|---|---|

| PLAINTIFF/PETITIONER: Mirage Systems, INC | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Jerry Speasl, Mark K. Roberts, et al | 1-05-CV-039164 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*               (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) *(Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. *(Code Civ. Proc., § 415.40.)*

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
    a. ☑ as an individual defendant.
    b. ☐ as the person sued under the fictitious name of *(specify):*
    c. ☐ as occupant.
    d. ☐ On behalf of *(specify):*
        under the following Code of Civil Procedure section:

        ☐ 416.10 (corporation)             ☐ 415.95 (business organization, form unknown)
        ☐ 416.20 (defunct corporation)        ☐ 416.60 (minor)
        ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
        ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
        ☐ 416.50 (public entity)           ☐ 415.46 (occupant)
                                   ☐ other:

7. **Person who served papers**
    a. Name: Anthony Ulmer, California Private Investigator # PI 15416
    b. Address: 1728 Kilbourn Street, Los Angeles, CA 90065
    c. Telephone number: (323) 691-7221
    d. **The fee** for service was: $ 356.80
    e. I am:
        (1) ☐ not a registered California process server.
        (2) ☑ exempt from registration under Business and Professions Code section 22350(b).
        (3) ☐ registered California process server:
            (i) ☐ owner  ☐ employee  ☐ independent contractor.
            (ii)  Registration No.:
            (iii)  County:

8. ☑ **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

    **or**

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 6/27/05

▶

_____                 _____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)        (SIGNATURE )

**CERTIFICATE OF SERVICE**

I, Amy A. Quinlan, hereby certify that on this 13th day of July, 2005, I

electronically filed the Supplemental Declaration of Caren K. Khoo in Support of

Defendants' Motion to Dismiss, Or, in the Alternative, Motion to Stay, Plaintiff's

Declaratory Judgment Action with the Clerk of Court using CM/ECF, which will send

notification of such filing to the following:

> Frederick L. Cottrell, III, Esquire
> Chad Michael Shandler, Esquire
> Richards, Layton & Finger
> One Rodney Square
> Wilmington, DE 19801

> Edward M. McNally (#614)
> Amy A. Quinlan (#3021)
> Morris, James, Hitchens & Williams LLP
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801
> (302) 888-6800
> emcnally@morrisjames.com
> aquinlan@morrisjames.com